**Marge PAYNE et al., and Barbara Jones, Plaintiffs,**

v.

**BOBBIE BROOKS, INC. et al., Defendants.**

**Nos. C77–822, C77–1008.**

United States District Court,
N. D. Ohio, E. D.

Dec. 16, 1980.

James Mancini, Cleveland, Ohio, for plaintiff Marge Payne in No. C77-822.

Warner Jackson, Cleveland, Ohio, for plaintiff Barbara Jones in No. C77-1008.

Andrew Ruzicho, Columbus, Ohio, Alan M. Rauss, Cleveland, Ohio, for defendants.

## ORDER

MANOS, District Judge.

The plaintiffs in the above-captioned race discrimination action represent the class of all blacks formerly employed by the defendant company, Bobbie Brooks, Inc., at its Kelley Avenue, Cleveland, Ohio distribution center who were terminated on or about January 1976. Plaintiffs originally initiated this case as a class action on August 2, 1977, alleging that the defendant discriminated against the class in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On February 24, 1978 this court conditionally certified the class. Commencing on September 15, 1980 the class claims of discrimination were heard in a trial to the court.

On September 19, 1977 Barbara Jones, one of the black Kelley employees who was terminated in January 1976, filed a separate cause of action alleging race discrimination against Bobbie Brooks. Her claim was tried on the same facts as the class action.

At the close of plaintiffs' case, defendants made a motion to dismiss under Rule 41(b) Fed.R.Civ.P. The court denied the motion and continued to hear evidence. At the close of all the evidence, on September 26, 1980 the court took the case under advisement and the parties submitted post-trial briefs.

Upon due consideration of the briefs of the parties, the exhibits and testimony adduced at trial, the court finds that judgment should be entered for the defendant on each of the claims of race discrimination. The following findings of fact and conclusions of law are filed in accordance with Rule 52(a).

## FINDINGS OF FACT

All of the plaintiffs worked at defendant's distribution center at Kelley Avenue

(Kelley). They allege that Bobbie Brooks, Inc. discriminated against them because of their race by preventing them from working at the company's distribution plant in Solon, Ohio. Specifically they allege that Bobbie Brooks' no-transfer policy between the Kelley and Solon plants, as well as the company's recruiting policies, operated to exclude them and other blacks from working at Solon, where supposedly job opportunities and security were better. The class further alleges that Bobbie Brooks discriminated against them by terminating sixty-nine black employees from Kelley in early January 1976. Finally, the class alleges that Brooks discriminated against them by refusing to recall or rehire laid-off or severed Kelley employees for openings which occurred at Solon in 1975, 1976 and 1977. The class alleges that in so doing Bobbie Brooks established a practice or policy of discrimination which continued from 1971 through 1977.

In early 1971 the business demands on Bobbie Brooks had exceeded the capacity of its sole northern Ohio distribution center located at Kelley Avenue. A business forecast for the company predicated that in 1972 Bobbie Brooks would be producing 2.4 million units per month, but that Kelley had a present capacity of 1.9 million units per month. Accordingly, the company had to expand and sent Tony Ferrante, Director of Distribution, to locate a suitable building for expansion. He first thoroughly examined sites near Kelley Avenue but all these locations were unsuitable, were of the wrong design, were too small or too dirty. Next he examined buildings in Twinsburg and Solon. The Solon site was ideal for the necessary expansion, and it was selected by Brooks.

The parties stipulated that at all relevant times the population in Solon was less than one percent black, that the population around Kelley was predominantly black, and that a majority of the work force at Kelley was black.

Before the Solon distribution center opened in March 1971, Brooks sent out several Kelley employees to set up the plant. Carlos Dabila, a Spanish surnamed American, and Clifford Hicks, a black, were among these employees. To staff Solon, Maurice Saltzman, Chairman of the Board of Bobbie Brooks, ordered that every consideration be given to Kelley employees for positions at Solon.

Accordingly in February and March 1971 Tony Ferrante held two meetings at Kelley in which he explained to the employees that the company was opening a new distribution center in Solon and that the company was offering them the right to transfer to the new plant. Those who transferred would have senior seniority because they would be the first out there. He also mentioned that the work at Solon used a more manual system and that there would be no air conditioning or tile floors. For the first few months, while time studies were being conducted, there would be no incentive wages, but that the average hourly wage would be protected. In addition to the two meetings, notices about the transfer offer were posted on the bulletin board, and the employees communicated the offer by word of mouth.

However, response to the transfer offer was very sparse; only two white employees, Wilma Poteet and Bernard Schonfield, applied for and received transfers. In March, Polly Wright, another black employee, asked for a transfer which was initially rejected by the company. She then filed a grievance with the union. Afterwards the company informed her that one of the persons employed at Solon had not reported and allowed the transfer.

Rhoda Smith, a black, talked to both Ferrante and her supervisor, Hicks, about transferring to Solon. Both explained to her that her job out at Solon would be much more manual and that they believed she could not handle it. Instead they suggested that she transfer to an incentive wage job at Solon. They reiterated what the necessary, but temporary, reduction in pay would mean while the time studies were being conducted and that in the long run, the incentive job would earn more. Smith testified that after hearing this she

became discouraged and gave up the idea of transferring. But at no time did anyone tell her she could not transfer out to Solon.

Nora Holden, a black, testified that when she inquired about transferring she was either given no response, or told: "You don't want to go out there." Dorothy Reeves, a black, testified that when she asked her supervisor about transferring, he told her that it was not the same type of job. However, Reeves also said that a few weeks later the company asked her to go to Solon to help train new employees.

Because there were so few transfers applied for from Kelley to Solon and because of the need to form a work force at Solon, Bobbie Brooks began hiring at Solon and instituted a no-transfer policy on March 30, 1971 between Kelley and Solon. Ferrante testified that the no-transfer policy was necessary to build a stable work force at Solon. The threat that Kelley employees could transfer to Solon with senior seniority and bump Solon employees would undermine forming a stable work force at Solon.

To fill the first twenty positions at Solon, Bobbie Brooks advertised in suburban newspapers and accepted walk-in applicants. Two blacks were initially hired, a Viet Nam veteran and another who did not report for work. In April 1971 Brooks reassigned two black supervisors, Clifford Hicks and Earlie Goldman, to Solon. The company also placed the sweater inspection department, which included three blacks, out at Solon. The company also had four Kelley employees go to Solon to help train the new employees. Of these four, two were Spanish, de Jesu and Carabella, and one was black, Crystal Foster. Bobbie Brooks implored the four to stay, but they refused. Thus, Ferrante estimated that of the original twenty-six or twenty-seven employees at Solon, six or seven were black. The parties stipulated that from April 1971 through January 1, 1976 the work force at Solon was composed of fifteen percent blacks.

In April 1971 Bobbie Brooks began contract negotiations for the Solon plant with the International Ladies Garment Workers Union, which also represented the Kelley employees. The company and the union agreed that Solon would have a separate local and a separate seniority list. Arrangements for separate locals and seniority lists are not uncommon in the industry. The union contracts for Kelley and Solon were otherwise identical. Local 29 represented Kelley; Local 52 represented Solon.

Helena Watson, a black Kelley employee, testified that between 1972 and early 1974 she inquired several times about a transfer to Solon. Each time she was told to talk to her union officials or that the company would get back to her. She was never given the transfer, but Al Garguilo, a union official, once successfully arranged for her to transfer to another department at Kelley, so she could improve her seniority status.

In 1973 Richard Grejtak, a white part-time employee, who worked four to five hours a night at Kelley, was told that he might be laid-off. A few days later, John Pristach, a Bobbie Brooks official, called him and told him he could work out at Solon. Jim Bongalis, a company supervisor, testified that Grejtak applied for a job out at Solon and in the fall of 1973 began working there.

In January 1974 the union contract at Kelley was renegotiated. One of the union demands was that the Kelley and Solon seniority lists be merged. This issue was resolved by a letter agreement dated January 1, 1974 which stated that if the Solon plant was physically expanded, or expanded by way of "tiering" and because of such expansion, additional jobs are created, employees of Kelley, then on lay-off shall have the right to apply for such jobs and shall have equal rights to such jobs along with other applicants. Any dispute regarding the application of the letter agreement would be subject to the grievance procedure. The company and the union resolved all other issues and the employees ratified the new contract. The differences between the Kelley contract and the Solon contract were minimal and not relevant to this case.

Beginning in 1974 and continuing through 1975, 1976 and 1977, Bobbie Brooks suffered a severe business decline. Net income fell from $109,000 for the year ending April 30, 1974 to a loss of $5,727,000 for the year ending April 30, 1975. As a result Brooks was forced to lay-off many of its employees; most of these lay-offs occurred at Kelley. In fact, by August 1975, sixty-seven Kelley employees were on lay-off. The union contract provided that a laid-off employee had a right to be recalled for a year after his lay-off date. If a year elapsed without the employee being recalled, he lost all of his benefits, including his seniority and would be terminated.

Thus, during 1975 Al Garguilo and Carlos Dabila, two union officials, asked Charles Gabele, Director of Distribution, to employ some of the laid-off Kelley workers at Solon. Usually Mr. Gabele would give no definite answer. But following one such request in September 1975, Gabele told Garguilo that he would use some of the laid-off Kelley people to eliminate a back-log which had developed at the Solon plant. Approximately thirty Kelley employees went out to Solon. Six worked on the second shift and the rest were on the third shift. The work lasted for about three to six weeks in September and October 1975. The employees admitted in their testimony that they knew the work was only temporary. One Kelley employee testified that Mr. Bongalis said that he hoped the employment would be permanent, but Bongalis denied ever making such a statement. That there was extra work in September and October 1975 is not surprising. Rosa Nell James testified that January, June and September were busy months and that the company would often hire temporary people to help during those months.

Plaintiffs claim that while the mainly black employees from Kelley were working at the mainly white Solon plant, two racial incidents happened. First, the Kelley employees complained that the white employees on the earlier shifts were grabbing all the good jobs. Al Garguilo investigated this complaint and learned that all the employees were equally guilty of trying to grab all the good jobs. Second, some of the Kelley employees complained to Garguilo that some of the Solon employees were spraying disinfectant at their work areas. However, Johnnie Johnson testified that the spraying was done as the Solon employees were leaving. Upon investigation Garguilo learned that the spray was for mildew; this was also done at Kelley. Race was not a factor in these actions at the Solon plant.

By the end of October all the Kelley employees who had worked at Solon, were on lay-off again. Throughout the rest of 1975 some hiring was done at the Solon plant. Bobbie Brooks, however, was under no obligation to notify the laid-off Kelley employees of these openings or to bring the laid-off employees to the Solon plant. The collective bargaining agreement between the union and Bobbie Brooks specifies that the seniority and recall provisions apply only to individual plants. There are no interplant rights. Moreover, for the rest of 1975 none of the laid-off employees made an application for a job at Solon.

Bobbie Brooks studied various proposals to cut costs. These ideas included moving the entire operation to Atlanta, constructing a new distribution building at Kelley and implementing new systems there. However, the efficiency of the Solon plant and the system used there over the system used at Kelley dictated that operations be terminated at Kelley and moved to Solon. Kelley used a conveyer belt system, which forced the distribution orders to go through the entire plant before the order would be completely finished. Solon relied on a more manual intensive system, in which workers would process the orders without having the order go through the entire plant. At Kelley the labor cost per unit in May 1975 was 11.11 cents,[1] this was 108.3% of what the planned cost was anticipated to be. In contrast the Solon plant's labor cost per

1. These figures exclude supervision costs.

unit was only 5.9 cents,[2] this was 76.9% of what the planned cost was anticipated to be. The company officials estimated that almost $500,000 could be saved in distribution costs. Therefore, toward the end of 1975, the decision was made to close the Kelley plant and move the existing Kelley operations to Solon.

At a union meeting in October 1975 some laid-off Kelley employees said that they wanted severance pay. By this time a number of employees had been on lay-off for almost a year and were aware that they would soon be terminated and lose all their benefits. Helena Watson testified that at the same meeting other employees said that they wanted their jobs rather than severance pay. Al Garguilo said he would look into it.

On October 29, 1975 union and company leaders met.[3] Garguilo testified that he asked the company to put the laid-off Kelley workers on a preferential hiring list. He claims that the company rejected this idea. The company officials have no recollection of such a demand. But all parties agree that the union did ask for severance pay. The company officials initially rejected the severance pay proposal by stating that they had no duty to pay severance, that business was bad, and that more lay-offs in the near future would be necessary. The company offered to retain the seniority lists, and call back the employees as needs arose. Finally, the company stated that it would cooperate with the union in any way possible so as to insure that eligible employees could receive union severance fund payments, so long as there was no extra cost to the company. At this meeting the company also informed the union of its decision to transfer Kelley operations out to Solon. This transfer would occur after the first of the year and be a gradual one. The company promised to keep the union informed on the progression of the transfer.

At subsequent meetings the union bargained and arranged for the company to pay severance. Some employees would receive $20.00 for each year of service; another group would receive $50.00. Company lawyer, Robert Rosenfeld, testified that this was more than what other Bobbie Brooks employees received who were severed at about the same time in other parts of the country.

Bobbie Brooks sent the notices of termination and the severance checks to seventy-five Kelley employees on December 31, 1975. Of these seventy-five only six were white. The Kelley employees received the checks from January 2 to January 5, 1976. Some like Helena Watson and Katie Smith cashed their checks on January 2. Dolores Kinney and Geneva Salters testified that they received their checks on January 5.

Rhoda Smith testified that after she received her severance check, she called Jim Bongalis and asked for a job at Solon. She claims that Bongalis transferred her to Gabele, who told her: "You don't have a job here." Both Bongalis and Gabele denied ever having such a conversation with Smith.

Helena Watson testified that after she received her severance check, she called Al Garguilo and asked about a transfer to Solon. Garguilo told her that business was bad right then and that she should wait a little and then go out to Solon and apply there. Garguilo testified that he gave similar advice to any employee who asked. He emphasized that the union was not a hiring hall.

On January 6, 1976 about twenty Kelley employees went first to the National Labor Relations Board to file a complaint. When the Board told them that they needed a copy of the contract, they went to the union hall. At the union hall Sam Janis held a meeting to discover the employees' preferences. He gave the employees a yellow legal-size sheet of paper and asked them to put down their names and whether they wanted the severance pay or their jobs back. Most of the employees wrote down that they wanted their jobs.

---

2. These figures exclude supervision costs.

3. By this time six employees had been on lay-off for more than a year.

However, the union never got back to the employees on the matter of getting their jobs back. On January 15, 1976 the union held another meeting, but it was only for the purpose of getting information for supplemental employment benefits. When Helena Watson asked Garguilo about jobs, he replied that he didn't have the information.

Beginning in March 1976 and continuing through July 1976, the remaining twenty-nine employees who were still working at Kelley Avenue were transferred in groups to Solon. Of these twenty-nine, fifteen were black. These employees were established in the K-wing of the Solon facility.[4] The two wings operated independently of each other. Local 29 continued to represent the employees in the K-wing and Local 52, the employees in the S-wing. Each wing retained its own seniority list.[5] Each wing hired independently. There were no transfers between the K-wing and S-wing. Nor were notices of openings in the S-wing posted in the K-wing.

In 1976 and 1977 people were hired at the Solon building. Throughout this period sixty percent of the new hires were temporary. Bobbie Brooks often relied on Manpower and Victor Temporaries to supply these temporary needs. Business was still generally bad in this period. In 1976 no one was hired in the K-wing. In the S-wing in 1976 a total of fifty people were hired, but a total of sixty-six were terminated. The company was able to meet all of its personnel requirements by relying on walk-in applicants or by word of mouth. The company did not advertise in the newspaper or other media.[6] Between January 1, 1976 and August 13, 1977 a total of ninety-eight people were hired at Solon. By stipulation the parties agreed that of these ninety-eight, fifteen were black.

From early 1976 and continuing through 1977, various severed employees asked Bobbie Brooks for letters of recommendation. Most of the employees received the letters. However, the company did not inform the employees of any job openings at Solon, when they requested the letters.

Union leaders, Al Garguilo and Carlos Dabila, testified that throughout 1976 and 1977 that they continually petitioned the company to rehire the severed Kelley employees, but to no avail. Dabila stated that Gabele at first refused their requests and then gave no reply. Garguilo said that he saw Gabele at least once a week and he inquired about rehiring the Kelley employees about eighty percent of the time. However, Gabele, Pristach and Rosenfeld in their testimony all positively denied that either Garguilo or Dabila ever asked them in 1976 or 1977 to rehire the severed Kelley employees.

Bobbie Brooks admitted that they never considered rehiring the Kelley employees because the union had asked for severance pay. Rosenfeld noted that the union wanted the severance pay so that it could pay the union supplemental benefits. A condition to these supplemental benefits was that if the terminating employer rehired within six months, the employees could not receive the union benefits.

No severed Kelley employee ever went out to Solon and filled out an application.[7]

4. Bobbie Brooks' facility at Solon was a U-shaped building. Its original Solon operation was in one prong of the building and the K-wing was in the other prong. In the base of the "U" between the two prongs was another business. Thus, the wings were physically separated.

5. At the time of the move from Kelley to Solon, Sam Janis in a conversation with Rosenfeld stated that at that time the union wanted separate seniority lists. But if the two plants were ever physically merged, the union would want the seniority lists merged. Rosenfeld said the company would examine that problem when it came to it.

6. From 1971 to 1974 Bobbie Brooks did advertise in various suburban newspapers. After September 1974 Brooks ceased such advertising. Employees often spread notices of openings by word of mouth; relatives of both employees and management were often referred to Brooks and were hired.

7. Filling out an application is an essential element in Bobbie Brooks' hiring policies. Whenever an opening occurred, the hiring supervisor

This court finds that none of the severed employees ever applied for a job at Solon.[8] Signing the yellow legal-size sheet at the union meeting was not enough to apply. Asking the company for letters of reference is not an application. Nor could union officials asking Bobbie Brooks to rehire the severed employees be considered an application. If while the Kelley employees were on lay-off Bobbie Brooks had no duty to inform them of openings at Solon, after termination the company certainly had no duty to notify them of openings.

On June 1976 Eaton Whitehead, a black employee at the K-wing, called Helena Watson and told her that white employees were being hired at Solon. They organized a meeting at a church with other severed Kelley employees to discuss their rights and what actions could be taken. On July 2, 1976 a number of severed Kelley employees filed complaints with the Equal Employment Opportunity Commission.

In August 1977 Bobbie Brooks' legal department, as part of settlement negotiations with the EEOC, advised the company to rehire the severed employees when the need arose. Because of improving economic conditions, the company decided to rehire all the severed employees and assign them to Solon. Over the course of several weeks, John Pristach called the severed employees from a list given him by the legal department. Of the seventy-five employees, twenty-six returned to employment with Bobbie Brooks. The employees were not given full seniority, except for benefits.

In 1978 because of continual improvement with the business, Bobbie Brooks' inability to rent the Kelley property, the prospect of renting the Solon facility and other business reasons, both the K-wing and the S-wing were transferred from Solon to Kelley. All Solon employees retained their full seniority and the seniority lists of both wings were merged, at the request of the union.

## CONCLUSIONS OF LAW

Defendant, Bobbie Brooks, questions plaintiffs timely filing with the EEOC. Plaintiffs counter by asserting that Bobbie Brooks committed separate, independent violations after the termination, that Brooks committed continuing violations and that there are equitable grounds for tolling the time limitations. This court accepts jurisdiction.

The plaintiffs base their claims for recovery on Title VII, 42 U.S.C. § 2000e et seq. under both the disparate treatment theory and the disparate impact theory. They also seek recovery under 42 U.S.C. § 1981.

In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court distinguished between disparate treatment and disparate impact cases under Title VII. It so noted:

"Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, e. g., Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265–266, 97 S.Ct. 555, 563–565 [50 L.Ed.2d 450]. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, e. g., 110 Cong.Rec.

---

would review the most recent application and evaluate the applicants on qualification and prior work experience. An interview would follow and the hiring decision would then be made. Because the personnel were usually needed immediately (or in the very near future), Brooks had to have someone with a present interest in the job. Thus, by relying on the recent applications, Brooks could meet its need of filling positions quickly.

8. Some of the employees gave different reasons why they did not apply. Katie Smith testified that she believed the company had a duty to recall because of the one-year clause in the union contract. Johnnie Johnson did not apply at Solon because the unemployment compensation was better.

13088 (1964) (remarks of Sen. Humphrey) ("What the bill does ... is simply to make it an illegal practice to use race as a factor in denying employment. It provides that men and women shall be employed on the basis of their qualifications, not as Catholic citizens, not as Protestant citizens, not as Jewish citizens, not as colored citizens, but as citizens of the United States").

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra,* at 1861. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Compare *e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 430–432, 91 S.Ct. 849, 853–854 [28 L.Ed.2d 158] with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806, 93 S.Ct. 1817, 1824–1826 [36 L.Ed.2d 668].

431 U.S. at 335, 97 S.Ct. 1854, n.15.

■ The Title VII claims of disparate treatment must be evaluated in accordance with the leading decision in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in which the Supreme Court held:

The complaint in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complaint's qualifications. . . . [9]

The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection. . . .

[If a legitimate, nondiscriminatory basis for the employer's action is articulated, the plaintiff must] be afforded a fair opportunity to show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext [for discrimination].

411 U.S. 802–804, 97 S.Ct. 1824–1825.

Proving a prima facie case under *McDonnell Douglas* establishes the critical finding of discriminatory motive because such a showing creates "an inference that an employment decision was based on a discriminatory criterion illegal under the act." *Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866. In *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the court elaborated on its reasoning, by holding that a prima facie showing under *McDonnell Douglas* "is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that these actions were bottomed on impermissible considerations."

Plaintiffs endeavored to establish a prima facie case in regard to the hiring practices of Bobbie Brooks at the Solon facility for 1975 through August 1977. The plaintiffs are members of a racial minority. The work done at Solon was very similar to the work done at Kelley, and plaintiffs could master such work after only a few days training. Therefore plaintiffs were qualified for openings at the Solon facility. Throughout the period Bobbie Brooks accepted applications and hired a number of people. Most of those hired were only temporary.

However, at the end of the case, the court found that what the plaintiffs believed were applications were not applications at

**9.** In a footnote accompanying this passage, the court noted that "[t]he facts will necessarily vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802, 97 S.Ct. at 1824, n.13.

all, and that they never applied for positions at Solon. The actual filing of an application at the plant was an indispensable element of Bobbie Brooks' hiring procedure at Solon: having a recent application on file permitted the company to fill openings with the required quickness. Thus asking for a letter of reference cannot be considered an application. The few isolated calls, by some of the plaintiffs inquiring why they were terminated and about jobs at Solon, cannot be considered an application. A severed employee writing on a yellow legal-size sheet of paper at a union meeting that he would like his job back cannot be considered a job application. There was no evidence presented that company officials even saw the list. Intercession on behalf of the employees by the union leaders in 1975, 1976 or 1977 cannot be considered an application. In 1975 Bobbie Brooks under the collective bargaining agreement had no obligation to transfer employees from one plant to another. After the termination the employees were like any other potential applicant. To be considered for a job they would have to apply formally. Al Garguilo testified that he advised the employees to apply at Solon. He also specifically denied that the union was a hiring hall. No severed employee applied for a job at Solon.

Plaintiffs cite *Chavez v. Tempe U. High Sch. Dist. No. 213*, 565 F.2d 1087 (9th Cir. 1977) for the principle that informal inquiries about a job can constitute an application. *Chavez* can be distinguished and is not applicable to the present case. In *Chavez* a high school teacher discussed an opening for a department chairmanship with the school principal in the principal's office. The court held that "[i]n light of the district's informal application procedures, [this] ... discussion ... must be held to constitute an application." 565 F.2d at 1092. The record contained evidence that teachers could apply for such position "simply by speaking" to the principal. Bobbie Brooks' application procedures were not so informal and required that an application be filled out. Thus informal inquiries could not be considered an application.

In *Teamsters, supra*, the court drew a narrow exception to the application requirement under *McDonnell Douglas*. It held that if a consistently enforced discriminatory policy deters job applications from minorities because they "are unwilling to subject themselves to the humiliation of explicit and certain rejection," potential applicants need not apply for the job to be provided the same presumption as an applicant under *McDonnell Douglas*. The court limited this exception to "[v]ictims of gross and pervasive discrimination." 431 U.S. at 367, 97 S.Ct. at 1871. This exception is not applicable to plaintiffs and Bobbie Brooks. That plaintiffs knew that they would be victims of "gross and pervasive discrimination" is not the reason why they failed to apply. Only two witnesses testified on why they did not apply. One said that unemployment compensation was better; the other believed that the company had a duty to call her back. Nor did Bobbie Brooks institute a gross and pervasive system of discrimination which would deter black applicants. The unions advice to apply at Solon, and Bobbie Brooks' hiring of blacks at Kelley and Solon prove that there was no such discrimination.

Plaintiffs cite *Hansbury v. Regents of Univ. of Cal.*, 596 F.2d 944 (10th Cir. 1979) for the proposition that if a "plaintiff could show that the defendants were aware of her continuing desire to be considered for employment ..., this showing could constitute the functional equivalent of an application." *Id.* at 949. However, plaintiffs' reliance on this case is misplaced. In *Hansbury* the plaintiff alleged that in 1970, because of sexual discrimination, she was laid-off from her job at the Los Almos Scientific Laboratory (LASL), which at that time was exempted from Title VII. She filed a complaint with the EEOC, which in November 1972 dismissed the claim on the ground it lacked jurisdiction at the time the charge was filed. By that time LASL had lost its exemption. Plaintiff immediately filed again with the EEOC, which determined that a violation occurred. The district court granted the defendant's motion to

dismiss. On appeal the plaintiff proposed several theories of post lay-off continuing discrimination to show that she had filed timely. The first was that LASL has discriminately applied its recall policy. The court accepted this theory. The court went further and analyzed plaintiff's second theory that LASL had discriminately refused her new employment after the 1972 amendments had taken effect. The court noted that there was difficulty with this theory because plaintiff filed her last formal application in 1970. The court then inferred "[h]er theory is apparently based on the doctrine of 'futility," and cited *Macklin v. Spectoe Freight System, Inc.*, 478 F.2d 979, 988 (D.C.Cir.1973) and *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011 (5th Cir. 1971), for support. Both of these cases present situations of gross and pervasive discriminations as provided for in *Teamsters, supra.* The court noted then that even the futility doctrine posed problems for the plaintiff because there were no cases which "[applied] the futility doctrine to situations where the futility arose before the employer's refusal to hire was made illegal under Title VII." 596 F.2d at 949. The court then held that an employer's awareness of the employee's continuing desire to be hired could be considered the functional equivalent of an application.

The fact situation of *Hansbury* is not present in this case. First, as already shown, the requisite futility because of race discrimination did not exist. Second, Bobbie Brooks was not initially exempted from Title VII. The Tenth Circuit placed special importance on this fact in concluding that the futility doctrine was not an adequate solution for plaintiff's situation. Third, the court was tentative in its holding: The "awareness could constitute the functional equivalent of an application." Because of Bobbie Brooks' peculiar needs often to fill temporary positions quickly, functional equivalents would not be sufficient. Brooks had to know who was willing to take a job right then. A scientific laboratory can take more time in its selection.

Moreover, the Tenth Circuit's ruling was not necessary for its decision. What plaintiffs in this case rely on is the court's analysis of Hansbury's alternative theory. In her EEOC complaint, Hansbury stated that she had been laid-off and not recalled. The court emphasized that in its opinion and held that a discriminatory recall policy would be grounds for relief.

Plaintiff also argues that by terminating the Kelley employees, sending severance pay, and closing the Kelley plant Bobbie Brooks "was indicating to plaintiffs that there would be no jobs available for them in the future", (Plaintiff's post-trial brief, p. 19) and it was futile to apply. The plaintiffs then conclude that the futility doctrine should apply. However, *Teamsters* and the other cases which plaintiffs cite, *Hailes v. United Airlines*, 464 F.2d 1006 (5th Cir. 1972) and *Hairston v. McQueen Trucking Co.*, 529 F.2d 226 (4th Cir. 1975), hold that the futility must be caused by discrimination, not an apparent lack of jobs. In the present case the union advice to apply at Solon and Bobbie Brooks' hiring of blacks there demonstrate that there was not the requisite discrimination.

■ Plaintiffs have not cited and this court has not found any other cases which would relax the application requirement of *McDonnell Douglas.* Therefore, because plaintiffs did not apply for a position at Solon, they have failed to establish a prima facie case under the disparate treatment theory of Title VII.

■ Title VII also provides for a disparate impact theory of recovery. The Supreme Court first enunciated this principle in *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849 (1971), when it held: "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853. The court further held that the plaintiff, in establishing that an employment practice is discriminatory, does not have to prove discriminato-

ry intent or motive: "... absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups...." 401 U.S. at 432, 91 S.Ct. at 854. In *Teamsters, supra,* the Court restated its holding: "[Claims of disparate impact] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.... Proof of discriminatory motive, we have held, is not required under a disparate theory."

After the plaintiffs have established the disparate impact of the practice, the employer has the opportunity to prove business necessity. The courts have held the following to be the standard for business necessity:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish it equally well with a lesser differential racial impact. *Robinson v. Lorillard Co.,* 474 F.2d 791 at 798 (4th Cir. 1971) and *Head v. Timken Roller Bearing Co.,* 486 F.2d 870 at 874 (6th Cir. 1973).

Under this theory plaintiffs assert that Bobbie Brooks' hiring procedures and its no-transfer policy had a disparate impact on the black employees at Kelley. The hiring procedures of relying on walk-in applicants, many of whom were relatives of employees or management or had heard of the job by word of mouth, and of advertising only in suburban newspapers, caused mainly blacks to staff the Kelley plant and mainly whites to staff the Solon plant. The no-transfer

policy prevented blacks from leaving Kelley and going to Solon, where plaintiffs allege that job opportunities and job security were better.

The hiring practice and the no-transfer policy are neutral on their face. But under these facts, the policies, in the words of *Teamsters,* did not "fall more harshly on one group than another." The hiring procedure permitted large numbers of both races to be employed by Bobbie Brooks under almost identical working conditions and almost identical chances for opportunity and security. The geographic distribution of the races in the greater Cleveland area caused the plant to be staffed primarily by different races, but even then the evidence shows that both plants were integrated. The real causes of any disparate impact between the races were the severe economic trouble of Bobbie Brooks and the efficiency of the Solon plant over the Kelley plant.

Plaintiffs rely heavily on *U. S. v. Georgia Power Co.,* 474 F.2d 906 (5th Cir. 1973); *Rock v. Norfolk and Western Railway Company,* 473 F.2d 1344 (7th Cir. 1973) and *United Transfer Loc. No. 974 v. Norfolk and W. Ry.,* 532 F.2d 336 (7th Cir. 1975)[10] to prove the disparate impact of such procedures. In *Norfolk and Western* the railroad had two adjacent terminal yards. Whites predominantly staffed the CT yard; blacks predominantly staffed the Barney yard. Each yard was represented by different locals of the same union. At both yards the classes of employees were brakemen, conductors and car retarder operators. The rates of pay were the same for both yards. The railroad practiced no active recruitment. Thus any vacancies were quickly filled by word of mouth or by relatives of present employees. Also a no-transfer policy essentially existed between the two yards: anyone transferring to the other yard would lose his seniority. However, the Barney yard was small and was "exclusively concerned" with the loading of coal. The CT yard was much larger and handled a

**10.** The two Norfolk and Western cases arise from the same facts; the 1975 case is an appeal from the remand of the 1973 decision.

wide range of more complex activities. Most importantly "[t]he record reflects that there was significantly less opportunity for work and for promotion, and significantly greater possibility of lay-off at Barney than at the CT yard." 532 F.2d at 340. In *Georgia Power* only 7.2% of the company's employees were black and these were hired almost exclusively for the most menial and lowest paying jobs in the company. Word of mouth recruiting within the company insured that the blacks would stay in those positions. In both cases the courts held the policies of the company to be discriminatory.

However, these cases must be distinguished from the Bobbie Brooks situation. In *Norfolk & Western* the lack of job security and the lack of opportunity for work and promotion were inherent in the Norfolk and Western employment scheme. The word of mouth recruitment policy "locked" the black employees into a discriminatory system of inequitable job opportunities. This is the crux of the racial discrimination in *Norfolk & Western*. In Bobbie Brooks no such inherent discrimination existed. Until the economic slump hit the company, both Solon and Kelley were equal with respect to pay, job promotion, and job security. Similarly, in *Georgia Power* the inequitable job distribution system and its perpetuation by word of mouth recruitment is not present in this case. Thus, the hiring procedures and the no-transfer policy did not have a disparate impact on the Kelley employees.

Moreover, the no-transfer policy instituted in March 1971 was a business necessity. Bobbie Brooks needed a stable work force at Solon. Allowing transfers from Kelley to Solon would undermine the stability of the Solon work force. No Solon employee would be able to build up seniority. Bobbie Brooks' reliance on walk-in applicants insured that the company could quickly hire people with a present interest in working. Thus it could meet its immediate needs. Bobbie Brooks also stopped advertising in newspapers in late 1974, at approximately the time the business slump hit the company and lay-offs began. Obviously the need

for advertising for employees had ceased and would be counterproductive for the company. As the court in *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468, 476 (1972) noted in dicta on business necessity: "It would be unreasonable for this court to expect the defendant to institute a . . . program which it cannot afford."

Next, plaintiffs allege that Bobbie Brooks' termination of the Kelley employees at the end of 1975 had a disparate impact on the black workers. Of the seventy-five people who were severed from Kelley, sixty-nine were black. Nobody from the predominantly white Solon plant was terminated. Whether or not the terminations had a disparate impact on the black Kelley employees, Bobbie Brooks established that the terminations were a business necessity.

By 1975, Bobbie Brooks' profits had fallen from $109,000 to a loss of over $5,000,000. The company had undertaken various studies to minimize its losses. Those studies revealed that the Solon plant was the more efficient distribution center. At Kelley the labor cost per unit was 11.11 cents, which was more than what the planned cost was anticipated to be. At Solon the labor cost per unit was 5.9 cents, which was less than what the planned cost was anticipated to be. Plans to improve Kelley, such as building a new distribution center or initiating new systems, were not as efficient as closing Kelley and moving the remaining departments to Solon. Bobbie Brooks would save $500,000 by doing so. This court holds that the company established that there was "an overriding legitimate business purpose" for their actions which was "necessary to the safe and efficient operation of the business." *Robinson v. Lorillard Corporation*, 444 F.2d at 798.

Citing *Lorillard, id.*, the plaintiffs argue that Bobbie Brooks did not prove business necessity because there were "alternative pratice[s] [which] better effectuat[ed] the intended purpose or [were] equally effective but less discriminatory. *Lorillard, id.* n.7.

Specifically, plaintiffs suggest that instead of terminating the Kelley employees, Bobbie Brooks could have merged the Kelley and Solon seniority lists or that whenever an opening occurred at Solon, Brooks could have recalled a Kelley employee. The court is not persuaded by the argument and holds that neither is an "acceptable alternative" which is required by *Lorillard*. In essence, plaintiffs ask this court to hold that a company in a precarious financial position must disregard a collective bargaining agreement and give an employee a job at a totally different plant, represented by a different local with its own collective bargaining agreement.

Under the collective bargaining agreement after a year of lay-off an employee would lose his seniority and his other rights, and be terminated. The agreement also provided that there were no interplant rights. Nor did it require the company to pay severance. By the time the severance letters were sent out on December 31, 1975, twelve Kelley employees had already been on lay-off over a year and were thus already terminated. At the K-wing throughout 1976 no one was hired. Thus by the provisions of the contract all the plaintiffs would have been terminated. Bobbie Brooks had no obligation to hire the Kelley employees at the S-wing or to pay severance. Absent some obligation to hire at the S-wing, the court should not now require that there was such an obligation under *Lorillard*. Plaintiffs do not cite any case under *Lorillard* which requires the employer to extend the employee's job rights at another plant. The cases that plaintiffs do cite are not controlling. *Miller v. Continental Can Co., Inc.*, 13 F.E.P. 1585 (D.C.Ga. 1975) provides a remedy for a discriminatory system which prevented blacks from transferring to better jobs at the same plant. *Smith v. Board of Public Instruction*, 3 F.E.P. 194 (M.D.Fla.1970), aff'd. 3 F.E.P. 197 (5th Cir. 1971) ruled on the specialized problem of tenured junior college professors and their rights when one campus of the junior college is forced to merge with two of the other campuses because of economic reasons. By paying severance Bobbie Brooks did more than it had to do.

Plaintiffs' final claim is based on 42 U.S.C. § 1981, which requires a showing that a company's action was motivated by discriminatory animus. *Williams v. DeKalb County*, 582 F.2d 2 (5th Cir. 1978) (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); and *Arnold v. Ballard*, 448 F.Supp. 1025 (N.D.Ohio 1978).

Plaintiffs have not discharged their burden to prove that Bobbie Brooks' actions were motivated by discriminatory animus. The strongest evidence plaintiffs presented to show the discriminatory animus were several isolated incidents in which one white employee was allowed to move from Kelley to Solon and a number of blacks who inquired about transfers but did not do so. Richard Grejtak, the white employee who transferred, was only a part-time employee who worked at most five hours a night. He was allowed to transfer to Solon. Polly Wright, despite some initial friction about her transfer to Solon, was permitted to transfer. Rhoda Smith also requested a transfer, but the company officials advised her that they thought she could not handle the job, but suggested another job at Solon, which she did not want. This does not show discriminatory animus. Nor can discriminatory animus be attributed to the company by a supervisor mistakenly telling Dorothy Reeves that her job would not be the same at Solon, when a few days later Bobbie Brooks asked her to train new Solon employees. Nora Holden inquired about transfer, but was told: "You don't want to go out there." Helena Watson inquired about a transfer between 1972 and 1974, which was after the no-transfer policy had gone into effect. The company did not make an exception to that policy but did help her to find a better position for seniority purposes at Kelley.

All plaintiffs are left with are one exception to the no-transfer policy made for a part-time employee and one unexplained rebuff to a transfer query. That is not enough to show discriminatory animus.

The no-transfer policy, the terminations at the end of 1975, the recruitment policies,

and the failure to rehire the severed employees because no applications were made all were done for reasons of business necessity and do not show discriminatory animus.

Moreover, the Supreme Court in *Furnco Const. Corp. v. Waters*, 438 U.S. at 580, 98 S.Ct. at 2951 held that the district court may consider the racial mix of the work force when determining motivation. The record shows throughout the history of the Solon plant, blacks were well represented. Bobbie Brooks offered the first positions there to blacks. Six or seven of the original twenty-seven positions were filled with blacks. From April 1971 through January 1, 1976 fifteen percent of the employees at Solon were black. In 1975 the company asked blacks to work at Solon to eliminate a backlog and from January 1976 to August 1977, fifteen of the ninety-eight hired at Solon were black. Moreover the company paid severance to the Kelley employees when it had no such obligation. All these facts mitigate against the finding of discriminatory animus on the part of Bobbie Brooks.

Because the plaintiffs have not demonstrated that the policies of Bobbie Brooks were racially motivated—as required in a disparate treatment case under Title VII and section 1981—or that the policies had a disparate impact which could not be justified by business necessity—as required in a disparate impact case under Title VII—the court enters judgment for the defendant on all causes of action.

IT IS SO ORDERED.