Douglas REILLY, Plaintiff,

v.

FRIEDMAN'S EXPRESS, INC., Defendant.

Robert HOPKINS, Plaintiff,

v.

FRIEDMAN'S EXPRESS, INC., Defendant.

Civ. Nos. 81–1305, 82–0022.

United States District Court, M.D. Pennsylvania.

Feb. 3, 1983.

Michael Roth, Scranton, Pa., for plaintiffs.

James Matthews, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiffs, Douglas Reilly and Robert Hopkins, commenced these actions against their employer, Friedman's Express, Inc. alleging that they were denied the opportunity to transfer from the defendant's terminal in Dorrance, Pennsylvania to a new facility in Scranton, Pennsylvania because of their ages in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. The defendant moved for summary judgment pursuant to Fed.R. Civ.P. 56. Plaintiffs opposed the motion and oral argument was held, on the record, on January 20, 1983. For the reasons set forth below, the motion will be granted.

## FACTS

The Defendant, Friedman's Express, Inc. (Friedman's) operates a motor freight line in Northeastern Pennsylvania with its main office in Dorrance, Pennsylvania. Dorrance also houses a terminal which until June, 1980, handled freight for the Wilkes-Barre, Hazleton and Scranton areas. In the early part of 1980 the defendant began investigating the possibility of opening a new terminal in the Scranton area because of the money-saving potential.[1] As work which was previously handled by the Dorrance terminal would now be handled in Scranton, Friedman's intended to transfer certain of its Dorrance employees to the new operation. Through the use of company records, Friedman's Operations Manager determined that thirteen employees would be needed in Scranton.

In accordance with its obligations under the National Master Freight Agreement,[2] Friedman's applied to the Central Pennsyl-

---

1. Because of the distance between Dorrance and Scranton, drivers spent a considerable amount of unproductive time traveling between the two cities before and after making deliveries. By opening a terminal in Scranton, Friedman's could eliminate this "stem time." In addition, these unproductive miles between Scranton and Dorrance were becoming more costly because of rising fuel costs.

2. The National Master Freight Agreement is a collective bargaining agreement between freight companies and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Article 8, Section 6 provides that when an employer contem-

vania Joint Area Grievance Committee for approval of its change of operations plan.[3] On June 13, 1980, the Committee approved the application and established a 60-day window period during which employee transfer or return rights with seniority would continue in the event the number of transfers turned out to be incorrect.[4]

While approval of the change of operations was pending before the Grievance Committee, the defendant posted a memorandum in May, 1980 requesting employees to indicate whether they wished to transfer to Scranton in the event the change was approved.[5] Both plaintiffs signed the memorandum. See Exhibit 4 to Document 25 of the Record. In terms of respective seniority among those wishing to transfer, Plaintiff Reilly ranked eighteenth and Plaintiff Hopkins ranked seventeenth. As there were thirteen individuals who signed the memorandum with greater seniority than the plaintiffs, the plaintiffs were not eligible for the transfer.

The change of operation, having been approved by the Grievance Committee, went into effect on June 21, 1980. The thirteen employees were transferred to Scranton but

replacements were soon needed on a day-to-day basis.[6] The President of Local 401, Francis Belusko, requested Friedman's to call "extra-list"[7] Dorrance employees in accordance with seniority, to work as replacements in Scranton. Friedman's agreed to the request, even though under the change of operations, it had the right to call whomever it wished to work as a replacement including someone "off the street" i.e., non-Friedman employees. Pursuant to the agreement, Plaintiffs, as well as several other Dorrance employees, were given the opportunity to work as replacements[8] at the Scranton terminal during the window period.

At the expiration of the sixty-day window period, company and union officials met to discuss the need for more than thirteen employees in Scranton as some members of Local 401 contended that more employees should have been eligible to transfer. After two meetings, held on August 26, 1980 and September 5, 1980, both Local 401 and a representative of the Eastern Conference of Teamsters concluded that the transfer of only thirteen employees was proper and did not violate the collective

plates transferring operations, it must obtain approval from the applicable "change of operations" committee, in this case, the Central Pennsylvania Joint Area Grievance Committee. Said Committee is composed of an equal number of Employer and Union Representatives. See Exhibit 2 to Document 25 of the Record.

3. Additionally, Friedman's met with officials from Teamsters Local 401, which represented Dorrance employees, and Local 229, which would have jurisdiction over the new Scranton terminal.

4. At the end of the 60-day period, a determination was to be made, based on the events during the period, as to whether thirteen was the proper number of employees. If more employees were needed, then additional Dorrance workers would be eligible to transfer. If less than thirteen were needed, the transferred employees were guaranteed return to Dorrance in accordance with seniority.

5. The memorandum stated that thirteen jobs would be transferred and the determination would be based on seniority.

6. One of the thirteen individuals transferred was injured shortly before the window period

began. Another transferee discovered he had cancer and stopped working. Yet another became disabled during the period. Additionally, replacements were needed to cover for those Scranton employees on vacation, sick, or otherwise absent.

7. "Extra-list" employees are those who are not guaranteed any hours of employment. These employees receive the opportunity to work through telephone calls when extra work is available unless, because of seniority, they are able to bid for a road or a city job. Both Plaintiffs are classified as "extra-list" employees.

8. The parties are agreed that replacements for the original thirteen were needed because of sickness, vacations, etc. See note 6 supra. The plaintiffs contend, however, that some Dorrance employees performed "necessary" work, and did not merely replace one of thirteen transferred employees. Other than the conclusory statements of the plaintiffs, the record contains no evidence to support this claim. Indeed, the record contains persuasive evidence to the contrary.

bargaining agreement. Indeed, the Central Pennsylvania Joint Area Grievance Committee upheld the propriety of the defendant having transferred only thirteen employees when a grievance challenging that number was filed by a member of Local 401.

After the window period ended, replacements were still needed for the Scranton employees on a day-to-day basis. Inasmuch as the agreement to call Dorrance employees was no longer in effect, the Manager of the Scranton terminal felt he could call anyone to work as a replacement. Because he needed immediate replacements, he called Dorrance employees. However, so as not to interfere with the Dorrance operation, he called individuals towards the bottom of the Dorrance seniority list.[9] Deposition of William Galetka, at 10–12.

Among those called as replacements were Charles Grimes (age 32), George Spunar (age 31), Thomas Richards (age 29), Bernard Strezelecki (age 43) and Carl Walkowiak (age 46).[10] Each of these five individuals commenced working as "extra-list" employees at the Scranton terminal on either September 10 or 11, 1980 following their request to work at that terminal. Prior to submitting such requests, these five apparently realized that, as they were at the bottom of the Dorrance "extra-list", they would have a better chance to work if they could get on the extra-list for Scranton. On their own initiative, after the expiration of the window period, they began inquiring about how to become a Scranton employee. Through union officials at both Local 401 and Local 229, they learned that they would have to fill out an employment application for the Scranton terminal and sign a statement relinquishing all seniority rights accrued through employment at the Dorrance terminal. These five individuals followed that procedure and commenced employment

at Scranton. Indeed, at a meeting of Local 401, a notice of which was posted on September 9, 1980, held on September 13, 1980, the procedure for commencing employment at the Scranton terminal was specifically discussed. Plaintiff Reilly attended said meeting. However, neither of the plaintiffs requested to work at the Scranton terminal in September, 1980 or completed an application for employment at that terminal. *See* Document 26 of the Record, Deposition of Robert Hopkins at pp. 12–13; Document 26 of the Record, Deposition of Douglas Reilly at p. 9. In September, 1980, Plaintiff Reilly was 49 years old and Plaintiff Hopkins was 52.

## DISCUSSION

The ADEA provides, in pertinent part:

> It shall be unlawful for an employer—(1) to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age....

29 U.S.C. § 623 (1975). The mandate of the ADEA is that employers reach employment decisions without regard to age; it does not mandate special treatment be accorded to those within the protected group. *E.g., Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *cf. Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981) (Title VII does not demand preferential treatment to minorities or women).

In order to establish a prima facie case of age discrimination, the plaintiff must satisfy the four criteria set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

**9.** Although plaintiffs dispute this motive, it was conceded at oral argument that the record contains no evidence to impeach Mr. Galetka's statement. Rather, plaintiffs rely merely on the fact that a jury could choose to disbelieve Galetka's testimony. Such reliance is misplaced when a motion for summary judgment

has been made. *See Klembecki v. Government Employees Insurance Company*, Civ. No. 82–0267, slip op. at 2–3 (M.D.Pa., Aug. 13, 1982).

**10.** Each of these individuals, except possibly Bernard Strezelecki, had worked at the Scranton terminal during the window period.

**622**

792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Although *McDonnell Douglas* was a Title VII case, the criteria promulgated therein have been applied to ADEA cases. *E.g., Smithers v. Bailar,* 629 F.2d 892, 894 (3d Cir.1980); *Rodriguez v. Taylor,* 569 F.2d 1231, 1239 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *accord, Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 69 (6th Cir. 1982); *Williams v. General Motors Corp.,* 656 F.2d 120, 127 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014–16 (1st Cir.1979). As modified to fit age discrimination cases, *McDonnell Douglas* requires a plaintiff to show he is a member of the protected age group, *i.e.,* at least forty but not older than seventy, 29 U.S.C. § 631 (Supp.1982); he applied and was qualified for the position; he was not appointed despite his qualifications; and the position was ultimately filled by a younger person. *See Smithers v. Bailar, supra,* 629 F.2d at 895. However, the *McDonnell Douglas* criteria should not be applied in a "rigid, mechanized or ritualistic" manner. "[I]t is merely a sensible or-

derly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). *See McDonnell Douglas, supra,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The central inquiry remains whether the employer discriminated against the employee because of his age. *Cf. Furnco Construction, supra,* 438 U.S. at 577, 98 S.Ct. at 2949.

■ Once the plaintiff has made out a prima facie case, the defendant has the burden of articulating a legitimate, non-discriminatory reason for rejecting plaintiff.[11] *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Once the defendant has produced evidence that would allow the conclusion that the employment decision was not based on a discriminatory animus,[12] the plaintiff has the opportunity to show that the proffered reason is a mere pretext. *Id.* at 255–56, 101 S.Ct. at 1094–95.

Friedman's Express advances two arguments in support of its motion for summary judgment. First, it argues that plaintiffs cannot establish a prima facie case of age discrimination. Second, even if a prima facie case is shown, the defendant has articulated a non-discriminatory reason for its action and there is no evidence that the reason is a pretext and that age was a determinative factor in plaintiffs not being hired. In response, plaintiffs assert that a prima facie case has been shown and that they have set forth sufficient evidence to raise a question of fact as to whether age was a determinative factor in plaintiffs not being hired at the Scranton terminal.

---

11. If the employer fails to articulate a non-discriminatory reason for his action, the employee is entitled to judgment inasmuch as an unrebutted prima facie case raises a mandatory presumption of discrimination. However, once a legitimate reason is articulated, the mandatory presumption is destroyed. *See Burdine, supra,* 450 U.S. at 254–55 & n. 10, 101 S.Ct. at 1094–95 & n. 10.

12. The employer need not prove a legitimate reason for his actions. Rather, the employer's burden is a burden of production. *Burdine, supra,* 450 U.S. at 258, 101 S.Ct. at 1096. The ultimate burden of persuading the trier of fact that age was "a determinative factor," *see Smithers, supra,* 629 F.2d at 898, in the employment decision remains at all times on the plaintiff. *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.

There is no dispute that the plaintiffs herein have fulfilled three of the *McDonnell Douglas* factors, *i.e.,* they are within the protected age group, they were not appointed despite their qualifications and the position was ultimately filled by someone younger. The dispute between the parties centers around whether the plaintiffs applied for the position. The defendant argues that since the plaintiffs did not apply to work at the Scranton terminal in September, 1980 their case must fail. The plaintiffs counter that they did apply to work in Scranton by signing the memorandum posted in May, 1980.

The requirement that an age discrimination plaintiff apply for the job is grounded in common sense. For if an application were not necessary, then nearly every decision to hire or promote would be subject to challenge. A concomitant requirement with the need for the plaintiff to apply for that job is that a job actually exists. *See Smith v. World Book—Childcraft International, Inc.,* 502 F.Supp. 96, 99 (N.D.Ill. 1980). *See generally International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977) (*McDonnell Douglas* formula requires plaintiff to show that his rejection did not result from the two most common reasons for rejection of a job application: lack of qualifications or absence of vacancy in job sought). For if no job exists, it would be impossible for a plaintiff to prove he was not hired because of his age.

*Smith v. World Book-Childcraft International, Inc., supra,* 502 F.Supp. at 99.

■ At the time plaintiffs signed the memorandum of May, 1980, there were thirteen positions available at the Scranton terminal. In accordance with its obligations under the National Master Freight Agreement, Friedman's was to fill these positions according to the relative seniority of those wishing to transfer. Under the change of operations plan, these thirteen positions were for full time employment and those transferred would retain any accumulated seniority. Thus, by signing the May memorandum, plaintiffs applied for a transfer to Scranton under the aforementioned terms and conditions. These thirteen positions were filled on June 21, 1980 when the change of operations went into effect. But plaintiffs do not base their claim on the fact that they were not transferred to Scranton pursuant to the change of operations. Rather their claim centers on the defendant's failure to call them as extra-list employees in Scranton.[13]

■ Unlike the thirteen employees who were transferred to Scranton through the June change of operations, those hired in September, 1980 were not full-time employees. More importantly, they were not transferred with seniority. They were classified as extra-list employees, without guaranteed hours of employment, and commenced employment without the benefit of such things as vacation and sick time accu-

---

**13.** The court would note that there appears to be a misconception on the part of the plaintiffs. The record in this case is replete with references such as "younger employees with less seniority" were called to work in Scranton. Indeed, in Plaintiff Reilly's EEOC complaint one of the reasons he lists as forming a basis for his belief that he was the victim of age discrimination is that prior to August 1980, all driving assignments and requests for transfers were based on seniority. *See* Exhibit A to Document 1 of the Record. Seniority, however, should not be confused with age; the two are unrelated. The ADEA prohibits discrimination against those within the protected age group and not those who have achieved greater seniority. "[T]he seniority a given plaintiff has accumulated entitles him to no better or worse treatment in an age-discrimination suit." *Wil-*

*liams v. General Motors Corp.,* 656 F.2d 120, 130 n. 17 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). The rights conferred by the attainment of a certain seniority are derived from collective bargaining agreements; the right to have employment decisions made free of a discriminatory animus is conferred by statute. A violation of seniority rights, without more, does not give rise to a cause of action under the ADEA. Concomitantly, the mere fact that an employer acted pursuant to the terms of a collective bargaining agreement does not, in the absence of a statutory exception, exonerate him from liability under the ADEA. The ADEA's "prohibition against age discrimination takes precedence over a collective bargaining agreement." *Levine v. Fairleigh Dickinson University,* 646 F.2d 825, 832 (3d Cir.1981).

mulated by their seniority status at Dorrance. These terms of employment differ significantly from the terms plaintiffs applied for by signing the May memorandum. Because of these differences, plaintiffs' applications in May, 1980 to be transferred to Scranton cannot be considered applications for employment as extra-list employees at that terminal.[14] *Cf. Leftwich v. Harris-Stowe State College,* 540 F.Supp. 37 (E.D. Mo.1982).

Neither can the plaintiffs' informal inquiries,[15] after the window period, about employment in Scranton constitute applications. There were formal procedures established for applying for work at the Scranton terminal. Information on how to apply at Scranton was disseminated at a Union meeting held September 13, 1980. The record in this case shows that each individual hired at Scranton after the window period complied with the application process. The record is devoid of any evidence that anyone was hired by making verbal inquiries. *Accord, Payne v. Bobbie Brooks, Inc.,* 505 F.Supp. 707, 715–16 (N.D.Ohio 1980). The apparent argument by plaintiffs that it would have been futile to apply at Scranton when they did learn of the procedure because they would have less seniority and, therefore, less work than those individuals who had already applied does not alter the fact that they failed to make timely applications. There is no evidence of concealment, evasion, or misinformation on the part of the defendant. Each of the individuals transferred testified that on their own initiative they sought information on how to transfer to Scranton and they received that information from their union and not from an employee of Friedman's. Although *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), created an exception to *McDonnell Douglas'* application requirement when the act of applying would be futile, *see id.* at 364–67, 97 S.Ct. at 1869–70, the futility must be caused by pervasive discrimination and not a lack of work. *Id.; see Payne v. Bobbie Brooks, supra,* 505 F.Supp. at 717. Since Plaintiffs did not apply to work at Scranton as extra-list employees, they cannot establish a prima facie case of age discrimination.

Nor is there any evidence in the record from which the court could conclude that defendant's failure to hire or transfer plaintiffs because they did not apply is a mere pretext. Plaintiffs rely on several statements made to them by Daniel Friedman to show age discrimination. One such statement was made in October, 1980 in response to plaintiffs' questioning Friedman as to why they were not transferred to Scranton. Friedman replied that maybe they were not qualified. A second statement relied on was made in June, 1982 when Friedman stated "if he had to do it [the change of operations] all over, he would do it differently." Even viewing these statements most liberally in favor of the plaintiffs, I

---

**14.** Neither are plaintiffs helped by the fact that the manager of the Scranton terminal called employees at the bottom of the Dorrance extra-list to work at the Scranton terminal after the expiration of the window period. First, a mere violation of plaintiffs' seniority rights, if indeed they extended to the Scranton terminal, does not state an ADEA claim. *See* note 13 *supra.* Second, even if a claim has been stated, the manager's deposition testimony that he called employees from the bottom of the seniority list so as not to interfere with the operation of the Dorrance terminal is unrebutted.

**15.** Plaintiff Reilly testified at his deposition that when the window period first ended he questioned the Dorrance terminal dispatcher as to whether there was any work in Scranton and was told "you are no longer in Scranton, you are in Dorrance." Deposition of Douglas Reilly, Document 26 of the Record at p. 10. He also testified, however, that other than signing the May memorandum, he never went to an individual in the company and asked to be transferred to Scranton, *Id.* at p. 9, although in October of 1980 he did question Daniel Friedman on why he was not transferred. *Id.* at 39–40.

Plaintiff Hopkins' deposition testimony was essentially the same except he testified that he talked to Francis Belusko, President of Local 401, in August, 1980 shortly after the window period ended about why he was not working at Scranton. Deposition of Robert Hopkins, Document 26 of the Record at pp. 14–15. He was told by Belusko that he could not go to Scranton because of the bargaining agreement. *Id.* at p. 17.

must conclude that they are totally innocuous and no inference of age discrimination may be drawn from them. Neither are plaintiffs helped by the alleged statement of Daniel Friedman that when a person becomes older he tends to become nonproductive. The statement makes no reference to the plaintiffs. Abstract age comments or generalities are insufficient to defeat a summary judgment motion. *See, e.g., Smith v. Flax,* 618 F.2d 1062 (4th Cir.1980).

In conclusion, after reviewing the record in this case, there exists no material issue which would preclude summary judgment. Plaintiffs have not established a prima facie case inasmuch as they never applied to work at the Scranton terminal after the expiration of the window period. Moreover, even if a prima facie case is assumed, there exists no evidence that defendant's actions were pretextual or that plaintiffs were the victims of age discrimination. Accordingly, defendant's motion for summary judgment will be granted. An appropriate Order will enter.