**Kansas E. MURRAY, Plaintiff,**

v.

**THISTLEDOWN RACING CLUB, INC., et al., Defendants.**

Civ. A. No. C 82–323.

United States District Court, N.D. Ohio, E.D.

Dec. 20, 1983.

Steven L. Wasserman, Coppins & Schneider, Cleveland, Ohio, for plaintiff.

John B. Lewis, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Kansas Murray, a mutuel clerk who ran up over $60,000 in shortages while working at Thistledown Race Track during 1979 and 1980, brings this reverse discrimination suit against her former employers because they refused to allow her to contin-

ue working until she signed a statement acknowledging that further shortages would be grounds for dismissal. Pending before the Court is defendants' Motion for Summary Judgment. Upon consideration, the motion is granted and the action is dismissed.

Murray contends that defendants Thistledown Racing Club, Inc.; Randall Racing Club, Inc.; Summit Racing Club, Inc.; and Cranwood Racing Club, Inc. ("the Racetrack") have violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Jurisdiction is invoked pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(4).

## FACTS

The relevant and material facts are not disputed. Kansas Murray is a white female who worked as a mutuel clerk for the Racetrack, which conducts horse racing activities at Thistledown Race Track. ("Thistledown"). During the 1979 racing season, Murray accumulated a total of $31,302.00 [1] in shortages. In 1980, she aggregated $29,501.00 in shortages, more than any other mutuel clerk at the track. Just before Murray was to begin work in 1981, the Racetrack insisted that she sign the following statement:

I _____ do hereby acknowledge that _____ of Thistledown management has formally advised me that after having been previously notified and warned of chronic shortages in my position as mutuel clerk, that any further shortages will clearly define incompetence to be so employed; and such shortages will result in my immediate dismissal from Thistledown Race Track.

She refused and has not worked at the Racetrack since. Murray contends that the Racetrack's actions constituted a constructive discharge impermissibly based on race. The Racetrack employs approximately 170 mutuel clerks during the week and about 200 on the weekends. Most of the mutuel clerks are white.

Mutuel clerks are assigned certain positions: seller, cashier, messenger (or "runner") and ticket counter. A seller's duties include taking bets from customers and insuring that the amount of money collected balances with the number of mutuel tickets sold. Cashiers are responsible for cashing winning tickets and balancing the number of tickets cashed with the amount of money paid out by the cashier. A messenger's duties include delivering money to cashiers as needed and taking the cashier's cashed tickets to the ticket room. Ticket counters are responsible for balancing the cashier's count of tickets with the actual number of tickets cashed.

All mutuel clerks are financially responsible for their own proven shortages, according to the terms of the collective bargaining agreement between the Racetrack and the mutuel clerks' union, (Racing Guild of Ohio, Local No. 304). The Racetrack's rules governing shortages provide in pertinent part:

18. Shortages will be subject for a warning and continued shortages could result in suspension and/or dismissal. Shortages *MUST* be paid the next day before beginning to work.

Kansas Murray's highest shortages occurred when she was working as a seller, collecting money from the persons placing bets.[2] In the last two months that she spent as a seller during the 1980 season, there were six separate occasions on which Murray had shortages of over $1,000 each. ($1,177 on September 5; $1,810 on September 14; $1,498 on September 19; $1,265 on September 21; $1,050 on September 28; and $1,957 on November 1, 1980). Murray was always able to repay her shortages before beginning work the next day, as required by the Racetrack's rules. However, after her last and highest ever shortage on November 1, 1980 (a Saturday night) Murray told Garvin Wright, Assist-

---

1. All figures have been rounded off.

2. It is possible for mutuel clerks working as sellers to gamble on the races, and the Racetrack has no rules forbidding the practice.

ant General Manager and Director of Mutuels at Thistledown, that she would be unable to pay the $1,900 shortage in time to work the following day and that she would have to travel to Indiana to get the money. She asked if Wright would allow her to work Sunday without first repaying her shortage. Wright denied her request and Murray did not pay her shortage until the following Thursday or Friday. She was not permitted to work during the interim. (Deposition of Kansas Murray at pp. 47–50). When she next reported for work, Murray was not returned to the seller's window, but was instead assigned a non-money handling job as a runner. She finished the season as a runner, and did not incur further shortages.

At the beginning of the 1981 season, Murray reported for work and was returned to a money-handling position. Midway through her first day on the job, Murray was called to Wright's office and told that, because of her history of chronic shortages, she would have to sign a statement acknowledging that she had been warned about her shortage problem and that she recognized that she could be terminated for future shortages. Murray was not terminated; she was merely given a choice between complying with Racetrack policy or forfeiting her right to continue working. Murray chose not to sign the statement and left the track. She has not returned to work at the Racetrack.

Instead, she filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"), alleging that she was discriminated against on the basis of race because the Racetrack asked her to sign the statement, but did not impose the same requirement on four black mutuel clerks who also had shortages. Both commissions found against Murray and the EEOC issued a Right to Sue letter. Murray then filed the instant suit under Title VII and 42 U.S.C. § 1981, alleging the same cause of action.

Murray contends that the Racetrack treated her more harshly than the four black mutuel clerks because the Racetrack feared that the black clerks would claim they were targets of discrimination.

The Racetrack contends that it presented Murray with the shortage statement because she had a continuing history of large shortages, far greater than those of the four black mutuel clerks. Murray's shortages were the worst that Wright, Director of Mutuel Clerks, had seen in his thirty-five years at the track.

The four black clerks to which Murray compares herself were also removed from money handling positions during the holiday months of November and December of 1980, but there the similarity ends. The four black clerks' individual shortages for the year totalled $9,021; $9,190; $11,265; and $16,888, respectively. Kansas Murray's shortages totalled $29,501.

## CONCLUSIONS OF LAW

### I. Title VII

■ Title VII of the Civil Rights Act of 1964 proscribes employment discrimination on the basis of race. The burden of proving impermissible discriminatory conduct on the part of an employer rests with the plaintiff. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To carry this burden, Kansas Murray must initially establish a *prima facie* case of discrimination. *Id.* In the Title VII context, the phrase *"prima facie* case" refers to the "establishment of a legally mandatory, rebuttable presumption" rather than the presentation of "enough evidence to permit the trier of fact to infer the fact at issue". *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981).

In *McDonnell Douglas, supra,* the seminal decision on race discrimination, the Supreme Court delineated four elements, which if proved, establish a *prima facie* case of race discrimination in hiring. However, the *McDonnell Douglas* court noted that its rule was flexible and would not apply to all Title VII cases, but would vary

according to the differing factual situations. *Id.*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. What does not vary is plaintiff's initial burden of "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Company Corporation v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ In reverse discrimination cases, the first prong of the *McDonnell Douglas* standard has been interpreted to allow a majority plaintiff to establish a *prima facie* case of intentionally disparate treatment when "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority". *Parker v. Baltimore and Ohio Railroad*, 652 F.2d 1012, 1017 (D.C.Cir.1981). The remaining elements of the test are modified to reflect the requirement that the plaintiff demonstrate he was treated differently than other similarly situated employees who were not members of the protected group. *Id.*

This Court finds this definition of a *prima facie* case, for purposes of reverse discrimination, to be consistent with the holding in *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976), that Title VII prohibits discriminatory preference for any racial group, minority or majority, and that the act covers "white men and white women and all Americans". *Id.* at 276, 96 S.Ct. at 2576.

### A. *Background Circumstances*

■ Murray has not established any background circumstances that would support the suspicion that the Racetrack is the unusual employer who discriminates against the majority. To the contrary, it is undisputed that the majority of mutuel clerks at the track were white. Neither does Murray even hint that practices grounded in an affirmative action program are at issue here.[3] Clearly, she has not met the first prong imposed for establishing a *prima facie* case. Recognizing that there may be situations in which isolated incidents of discrimination may occur in a setting which does not raise suspicions that the majority is the object of discrimination, this Court finds it appropriate to consider whether Kansas Murray, a white female, was treated differently than other similarly situated mutuel clerks who were black.

### B. *Similarly Situated Employees*

Kansas Murray's attempt to compare herself to the four black mutuel clerks fails when the relevant facts are examined. She had the largest and most frequent cash shortages among the five clerks for both the 1979 and 1980 racing seasons. Her individual shortages in 1980 exceeded the combined shortages of three of the black mutuel clerks and almost doubled the shortages of the clerk with the second highest shortages in the group. This was virtually a replay of the 1979 season, when her total shortages exceeded the combined shortages of three of her black co-workers and doubled the shortages of the black clerk who incurred the second highest shortages. For two years at Thistledown,[4] Kansas Murray mounted a work record of staggering shortages despite the Racetrack's rule providing that continued shortages could result in suspension or dismissal. Kansas Murray's consistent record of large shortages sets her apart from the

---

**3.** Cf. *McDonald v. Santa Fe Trail*, 427 U.S. at 280 n. 8, 96 S.Ct. at 2579 n. 8 (permissibility of affirmative action program not considered); and *Parker v. Baltimore and Ohio Railroad Co.*, 652 F.2d at 1017 n. 9 (affirmative action program does not equate with discrimination against the majority nor constitute suspicious circumstances inferring discriminatory intent.)

**4.** Kansas Murray's shortages as a mutuel clerk were not limited to her employment at Thistledown. While working at Northfield Race Track, Murray ran up large shortages; her last shortage totalled $1,100 for one day. She was dismissed shortly thereafter and filed charges of sex discrimination against Northfield.

black mutuel clerks to whom she compares herself.

Moreover, the circumstances surrounding Murray's last shortage set her apart from the other mutuel clerks. On a Saturday night, Murray incurred the largest single shortage in the history of her employment. She was nearly $2,000 short. She was unable to repay the shortage before she was to begin work the next day, as required, so she was suspended from work. In explaining her inability to pay promptly, Murray said she would have to travel out of state to obtain the money. Clearly, these facts indicate that not only did Murray incur enormous shortages, she also subjected the Racetrack to the very real risk of never recovering this substantial shortage. The circumstances put her in a disciplinary category unparalleled by any facts established regarding the black mutuel clerks.

The law is clear that an employer's rules and criteria must be applied alike to all members of all races. *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825. The undisputed facts establish that the Racetrack applied its rules equally to blacks and whites alike.

### C. *No Genuine Issues of Material Fact Exist*

■ Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden of showing the absence of any genuine factual disputes is on the party seeking summary judgment. *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). When considering a motion for summary judgment, the Court must view the material presented by the moving party in the light most favorable to the party opposing summary judgment. *Id.* After considering the record in a light most favorable to Murray, this Court finds that she has failed to refute the documentary evidence supporting the facts propounded by the Racetrack.

Kansas Murray attempts to suggest that there is some factual dispute over whether all mutuel clerks actually paid their shortages before working, as required by the Racetrack's rules. She claims, in an affidavit, that she has "personal knowledge" that the four blacks to whom she compares herself were allowed to work without paying their shortages. Her self-serving affidavit, and the affidavit of Robert Doyle, her union representative, do not meet the standards set forth in Fed.R.Civ.P. 56(e).

The Rule provides that a party opposing a motion for summary judgment which has been supported by affidavits must set forth specific facts in her own affidavits showing that there is a genuine issue for trial. These affidavits "shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e). Neither Murray nor Doyle have stated affirmatively or otherwise that they are the keepers of the records regarding shortages or that they have any basis for knowing when shortages were paid and by whom. Murray's and Doyle's averments regarding the timing of shortage payments are insufficient because they failed to state their competence to testify about these matters. Rather, the testimony of Garvin Wright and Robert Harvey, the "over and short man" in the Money Room at Thistledown, established that Wright and Harvey are responsible for the record-keeping and collection of shortages. Wright testified that he never allowed an employee to work unless his or her shortage was paid. (Wright's deposition at 39–41). He further testified that Harvey, who collected the shortages, must have done so as instructed because the accounts always balanced. *Id.* at 41. Wright, as director of mutuel clerks, was responsible for enforcing the Racetrack's rules, and his testimony indicates that he applied the shortages payment rule equally to all employees. Wright's testimony meets the specificity and competency requirements of Fed.R. Civ.P. 56(e). This Court finds that the facts contained in his testimony are not

disputed by Doyle's and Murray's insufficient affidavits.

Doyle also contended that Murray's shortages could not have been the basis for the Racetrack's actions because in Doyle's opinion, shortages are "meaningless". Again, Doyle's competency to advance this fact is not affirmatively stated in his affidavit. Rather, his characterization of the shortages as "meaningless" is based on his "opinion and belief". Doyle suggests that, if shortages are a result of a mutuel clerk's practice of betting on races at the track, the track may actually gain money on a clerk who is short, as long as the clerk pays the shortage the next day prior to the start of work. Doyle's characterization of the shortages as "meaningless" does not explain why it was necessary for Thistledown to employ a person, *i.e.*, Robert Harvey, specifically to collect and keep track of mutuel clerks' shortages and overages.

Doyle's affidavit also avers that Murray was never warned or suspended for shortages. However, Doyle again fails to provide his competency to so state, and his statement directly conflicts with Murray's own testimony that she was suspended and not allowed to work the Sunday following her $1,957 shortage and that when she returned to work almost a week later, she was relieved of her seller's duties *for the rest of the season* after talking to Wright about her shortage. (Murray's deposition at 46–50). Clearly, Doyle's affidavit is a lame attempt to raise a factual dispute where Murray's own testimony indicates otherwise. Mabell Seller's testimony (that she was suspended when unable to pay her shortages) substantiates Wright's testimony that the Racetrack's shortage rules were applied equally to black and white employees.

The undisputed fact that Murray had far greater and more frequent shortages than any other mutuel clerk at the track alone is adequate to establish that she was not simi-

larly situated to the other mutuel clerks to whom she compares herself. Her unique shortage problem prompted the Racetrack to devise a policy to cope with her situation and that of other employees who had large and repeated shortages. It is preposterous for Kansas Murray, the mutuel clerk with the greatest shortages, both in terms of amount and frequency, to allege that, because she was the first person [5] affected by the new policy, she was discriminated against on the basis of race. Murray's position was not comparable to the black employees to whom she compares herself, hence she is unable to establish that she was treated differently than other similarly situated employees. Moreover, it is clear that the Racetrack's decision to present Murray with the statement was completely consistent with its posted rule governing shortages. The inference of discriminatory animus outlined in *McDonnell Douglas* has not been raised by the undisputed relevant facts in this case. As explained in *Furnco Construction Company, supra,*

> ... when all legitimate reasons ... have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

*Id.*, 438 U.S. at 577, 98 S.Ct. at 2949. This Court concludes that Kansas Murray has not established a *prima facie* case which raises the inference that the Racetrack's actions toward her were based on impermissible racial considerations. She has failed to prove the elements necessary to establish a *prima facie* case or a claim under Title VII. Accordingly, the Racetrack is entitled to summary judgment.

## II. *Murray's Section 1981 Claim*

In actions premised on 42 U.S.C. § 1981, a plaintiff must prove intentional discrimination based on race. *General Building Contractors Association, Inc. v. Pennsyl-*

---

5. In fact, another mutuel clerk, Gary Mascie, was also presented with the shortage statement on March 20, 1981, the same day it was given to Kansas Murray. However, neither party has explored Mascie's situation further, or ascertained whether Mascie or Murray was approached first.

*vania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Memphis v. Greene,* 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981); *Payne v. Bobbie Brooks, Inc.,* 505 F.Supp. 707, 720–21 (N.D.Ohio 1980), *aff'd without opinion,* 701 F.2d 180 (6th Cir. 1982), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982); and *Arnold v. Ballard,* 448 F.Supp. 1025 (N.D.Ohio 1978).

For the reasons outlined above, there is no evidence substantiating Murray's claim that the Racetrack discriminated against her, nor is there anything in the record which indicates discriminatory intent or improper racial motivation. Accordingly, Murray's claim under 42 U.S.C. § 1981 must fail. The Racetrack is entitled to summary judgment on Murray's § 1981 claim as a matter of law.

The Motion for Summary Judgment is granted and the action is dismissed, with prejudice, at plaintiff's costs.

IT IS SO ORDERED.