OPINION
Plaintiff-appellants James Johnson, et al. appeal from the February 26, 2001, Memorandum Opinion and Order of the Richland County Court of Common Pleas granting the Motion for Summary Judgment filed by defendants-appellees General Motors Corporation, et al.
 STATEMENT OF THE FACTS AND CASE
Appellants James Johnson, David Wert and Anthony Walker as well as James Avery have been employed by appellee General Motors Corporation (hereinafter referred to as "GM") in the blank and shear department in the Mansfield plant since 1996. While appellants are white, Avery is black. All are bargaining unit members.
On September 10, 1999, appellants filed a complaint against GM, Thomas Chiudioni, a Labor Relations Analyst at GM Mansfield, and James Avery. Appellants, in their complaint, alleged the following:
 Reverse racial discrimination under R.C. Section 4112.02(A);
 Retaliation under R.C. Section 4112.02(I) by appellee GM in response to the appellants' supporting a civil rights action brought by Ron Damron, a fellow employee, against appellee GM;
Intentional infliction of emotional distress;
Negligent infliction of emotional distress;
Breach of duty to provide a safe workplace
Negligent hiring and/or retention of James Avery;
Defamation;
Common law whistleblower.
Appellant James Johnson specifically alleges that in 1997, James Avery twice accused him of racist speech or conduct. In January of 1997, Johnson was discussing a television program about sex in different cultures, including a tribe in South America whose members have sex in trees, with another employee when Avery, who overheard the conversation, became upset and accused appellant Johnson of being a racist. According to Johnson, "Mr. Avery accused me of saying that that's how all black people have sex and did you think we all act like that and calling us a bunch of monkeys because of the reference to those people living in trees offended him, also." Deposition of James Johnson at 19. After Johnson spoke with Candy Curry in GM's Labor Relations Department about the incident and told her that he had been recounting a television program, Curry discussed the incident with Avery. Curry later informed Johnson that, "he [Avery] had accepted her explanation of it and that I was in the clear and that I didn't have anything to worry about." Deposition of James Johnson at 24. Appellant Johnson was never disciplined for the incident. While Johnson claims that, at approximately the same time as the above incident, Avery threatened to whip "my honky ass", Johnson did not report the threat to GM's management." Deposition of James Johnson at 42. Since 1997, Avery has not threatened Johnson personally.
The second incident involving appellant Johnson occurred in August of 1997 when Avery complained to management about a "spider web" tattoo on Johnson's elbow that Avery claimed identified Johnson as being a member of the Aryan Brotherhood white supremacist group. During his interview with appellee Thomas Chiudioni of Labor Relations, at which Avery was present, Johnson denied that the tattoo had "any significance along those lines." Deposition of James Johnson at 29. According to Johnson, "Mr. Avery, from my knowledge or my understanding, accepted my explanation of my tattoos not having significance like that and stated that he did not wish for me to cover them up." Deposition of James Johnson at 30. Johnson and Avery then shook hands. Neither appellee Thomas Chiudioni nor anyone in appellee GM's management ever directed Johnson to wear long sleeves or disciplined him in any way over the tattoo.
Johnson further contends that appellee GM retaliated against him "through intimidation" for supporting a federal lawsuit filed against appellee GM and Avery by Ron Damron after Damron allegedly was assaulted by James Avery. According to Johnson, no one in appellee's GM's Management ever came to him and in any way threatened his job if he testified on Damron's behalf.
Appellant Anthony Walker also alleges that he was the victim of harassment by James Avery. According to Walker, appellee GM's Management "told me that he [Avery] was offended by [my use] of the word neighborhood because to him that would imply black racial strife or something." Deposition of Anthony Walker at 8. After Avery spoke with Frank Reed, Walker's supervisor, Walker was told that he "should watch what I say in front of James Avery because it upsets him." Deposition of Anthony Walker at 9. Walker was not otherwise disciplined over the incident. Walker also alleges that, in November of 1999, during a conversation with Avery about Ron Damron, Avery said "You know, when I go home, my babies ask me, `Daddy, you got any problems? . . . All I have to do is tell them yeah and there would be a dead mother fucker.'" Deposition of Anthony Walker at 14. Walker took Avery's comment as "a blanket statement that anybody that messed with him would have some problems." Id. While Walker reported the alleged personal threat to Frank Reed in management, Avery was never disciplined for the same. When questioned during his deposition whether James Avery had ever threatened him with bodily harm, Walker responded in the negative.
Walker, like Johnson, also alleges that appellee GM retaliated against him for agreeing to testify on behalf of Ron Damron in Damron's lawsuit against appellee GM and Avery. According to appellant Walker, appellee GM knew that he was supporting Damron's lawsuit "because we kind of buddied up together. There was four or five of us that kind of hung out." Deposition of Anthony Walker at 40. Walker admitted during his deposition that his support for Damron has consisted primarily of "moral support." According to Walker, appellee GM retaliated against him for supporting Damron by investigating a female employee's complaint regarding an off color joke that she found offensive. Walker had told the joke to a foreman who, in turn, related the same to the female employee. Although Walker was interviewed by appellee Thomas Chiudioni about the joke, Walker was not disciplined in any way over the same
Similarly, appellant David Wert maintains that James Avery has threatened him and called him a racist on several occasions. The first incident occurred in June of 1996 when Avery threatened to kick Wert's "white mother fucking ass" and called him a "white racist son-of-a-bitch" while Wert was showing Avery how to operate a machine. Deposition of David Wert at 6, 7. After Wert reported the incident to his supervisor, Avery was assigned to work on another machine but was not otherwise disciplined. According to Wert, a couple of times in 1997 and 1998, Avery "come down and would stand by my tool box to try and intimidate me." Deposition of David Wert at 9. During the incidents, Avery "stood there and smiled." Deposition of David Wert at 10. When Wert reported the incidents to Don Burns in management, Burns "just laughed." Id at 10. According to Wert, another incident involving Avery occurred in February of 1998 when Avery reported to appellee Thomas Chiudioni that Wert had used the word "chink" as an ethnic slur. After appellant Wert, who denied using the word "chink" in a derogatory manner, was interviewed by appellee Thomas Chiudioni, the matter was later dropped. Wert also claims that after declaring that he would support and testify in favor of Ron Damron in his lawsuit against appellee GM, he was retaliated against since appellee GM "immediately investigated the claim [regarding Wert's use of the word "chink"] all to [his] detriment and harm." (See Appellants' brief at 21).
Appellant Wert also contends that a number of incidents of alleged misconduct by Avery occurred after appellants filed their compliant in the case sub judice. According to Wert, Avery, in December of 1999, twice threatened to "kick my white mother fucking ass" as Wert walked past him. Deposition of David Wert at 12. Although co-workers heard yelling, no one was able to "make out the words". Deposition of David Wert at 12. As a result of Wert's complaint, Dan Crowder in Labor Relations spoke with Avery. Since Avery denied threatening appellant Wert and since no one had overheard Avery's alleged threats, Avery was not disciplined based on GM's policy of not disciplining a bargaining unit employee based solely upon the uncorroborated statement of another bargaining unit employee.
As is stated above, appellants, as a result of the above alleged incidents of threats and intimidation by Avery, filed a complaint against GM, James Avery and Thomas Chiudioni on September 10, 1999, in the Richland County Court of Common Pleas. With leave of court, a Motion for Summary Judgment was filed by appellee GM and Thomas Chiudioni on November 7, 2000, to which appellants filed a memorandum in opposition on January 5, 2001. After a reply brief was filed by appellants on February 7, 2001, the trial court, as memorialized in a Memorandum Opinion and Order filed on February 26, 2001, granted appellees' motion and dismissed appellants' claims against appellee GM and Thomas Chiudioni.
It is from the trial court's February 26, 2001, Memorandum Opinion and Order that appellants prosecute their appeal, raising the following assignments of error:[1]
 ASSIGNMENT OF ERROR I THE TRIAL COURT ERRED IN GRANTING DEFENDANT/APPELLEE(S) MOTION FOR SUMMARY JUDGMENT BECAUSE THE PLAINTIFFS/APPELLANTS DEMONSTRATED A PRIMA FACIE CASE OF REVERSE DISCRIMINATION IN VIOLATION OF OHIO REVISED CODE 4112.02.
 ASSIGNMENT OF ERROR II THE TRIAL COURT ERRED IN GRANTING DEFENDANT/APPELLEE(S) MOTION FOR SUMMARY JUDGMENT BECAUSE DEFENDANT/APPELLEE(S) FAILED TO PROVIDE A SAFE AND FREE FROM HOSTILITY WORK ENVIRONMENT TO THE PLAINTIFF/APPELLANT(S).
 ASSIGNMENT OF ERROR III THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO CONSIDER THE DOCTRINE OF NEGLIGENT INFLICTION OF MENTAL DISTRESS AS AN ALTERNATIVE THEORY TO PRECLUDE THE GRANTING OF DEFENDANT/APPELLEE(S) MOTION FOR SUMMARY JUDGMENT.
 ASSIGNMENT OF ERROR IV THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANT/APPELLEE, THOMAS CHIUDIONI BECAUSE PLAINTIFF/APPELLANT, DAVID TODD WERT HAD PROVEN A PRIMA FACIE CASE OF INTENTIONAL INFLICTION OF MENTAL DISTRESS.
 ASSIGNMENT OF ERROR V THE PLAINTIFF/APPELLANT(S) ON NUMEROUS OCCASIONS BROUGHT DEFENDANT, JAMES AVERY'S PROPENSITY TO ASSAULT AND THREATEN FELLOW EMPLOYEES AT DEFENDANT/APPELLEE, GENERAL MOTORS CORPORATION, CPC IN MANSFIELD, THEREBY SATISFYING THE REQUIREMENTS OF A STATUTORY CLAIM FOR WHISTLE BLOWING; THEREFORE, THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE DEFENDANT/APPELLEE(S) ON PLAINTIFF/APPELLANT'S WHISTLE BLOWING COUNT.
 ASSIGNMENT OF ERROR VI THE TRIAL COURT ERRED IN GRANTING DEFENDANT/APPELLEE(S) SUMMARY JUDGMENT BY NOT CONCLUDING THAT PLAINTIFF/APPELLANT(S) HAD BEEN RETALIATED AGAINST FOR PARTICIPATING IN PROTECTED ACTIVITY IN VIOLATION OF OHIO CIVIL RULE 4112.02(I).
 ASSIGNMENT OF ERROR VII THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING THAT THE PLAINTIFF/APPELLANTS' INTENTIONAL TORT CLAIMS WERE PREEMPTED DUE TO THE EVIDENCE OF A COLLECTIVE BARGAINING AGREEMENT.
 ASSIGNMENT OF ERROR VIII THE TRIAL COURT ERRED IN NOT FINDING THAT DEFENDANT/APPELLEE, THOMAS CHIUDIONI COULD BE HELD INDIVIDUALLY LIABLE TO THE PLAINTIFF/APPELLANT(S) FOR DISCRIMINATION AND HARASSMENT.
 ASSIGNMENT OF ERROR IX THE TRIAL COURT ERRED IN NOT APPLYING THE DOCTRINE OF CONTINUOUS VIOLATIONS TO PRECLUDE THE RAISING OF THE STATUTE OF LIMITATIONS DEFENSE.
 ASSIGNMENT OF ERROR X THE TRIAL COURT ERRED AS A MATTER OF LAW BY GRANTING DEFENDANT/APPELLEE(S)' MOTION FOR SUMMARY JUDGMENT DUE TO THE FACT OF THE TRIAL COURT NOT GIVING SUFFICIENT WEIGHT TO THE THIRD PARTY AFFIDAVITS IN SUPPORT OF PLAINTIFF/APPELLANT(S)' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ATTACHED THERETO SUPPORTING THE PROPOSITION THAT DEFENDANT/APPELLEE, GENERAL MOTORS CORPORATION, CPC WAS CREATING AN UNSAFE WORK ENVIRONMENT BY PERMITTING DEFENDANT, JAMES AVERY TO SELECTIVELY ASSAULT AND THREATEN THE WHITE EMPLOYEES WHICH WOULD FURTHER SUPPORT THE APPLICATION OF THE DOCTRINE OF CONTINUOUS VIOLATION TO BAR THE STATUTE OF LIMITATIONS DEFENSE.
 STANDARD OF REVIEW
Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35,36. Civ.R. 56(C) states in pertinent part:
 Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall (1997), 77 Ohio St.3d 421, 429, citing Dresherv. Burt (1966), 75 Ohio St.3d 280.
It is based upon this standard we review appellants' assignments of error.
 I
Appellants, in their first assignment of error, argue that the trial court erred in granting appellees' Motion for Summary Judgment as to appellants' reverse discrimination claims under R.C. 4112.02(A). Appellants specifically maintain that they were the victims of disparate treatment.
The elements of a reverse discrimination claim were set forth in Murrayv. Thistledown Racing Club, Inc. (6th Cir. 1985), 603 F. Supp. 479, in which the court held as follows:
 In reverse discrimination cases, the first prong of the McDonnell Douglas[2] standard has been interpreted to allow a majority plaintiff to establish a prima facie case of intentionally disparate treatment when "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority". Parker v. Baltimore and Ohio Railroad, 652 F.2d 1012, 1017
(D.C. Cir. 1981). The remaining elements of the test are modified to reflect the requirement that the plaintiff demonstrate he was treated differently than other similarly situated employees who were not members of the protected group. Id.
Murray, supra. at 483.
In the case sub judice, the trial court specifically found both that appellants had failed to establish "background circumstances support[ing] the suspicion" that appellees are that unusual employer who discriminates against the majority and that appellants were treated differently than other "similarly situated employees who were not members of the protected group." Appellants specifically maintain that appellees have discriminated against white employees by allowing James Avery, a black employee, to assault and intimidate white male employees with impunity.
While the record establishes that Avery physically assaulted Ron Damron, a GM employee, in January of 1997, the record further reveals that, as a result of the assault, Avery was suspended one week by GM. Thus, Avery clearly was sanctioned by appellee GM for his behavior in assaulting Ron Damron. Appellants also point out that Avery, on or before September 23, 2000, threatened Robert Sallee, a "similarly situated employee" with physical harm twice during his shift. Sallee, in his affidavit that was attached to appellants' brief in opposition to appellees' Motion for Summary Judgment, stated, in part, as follows:
 AFFIANT FURTHER SAYS that during the third shift on September 23, 2000, James Avery became violent and threatened to physically assault the Affiant.
 AFFIANT FURTHER SAYS that this altercation was so noisy that two (2) of the die makers on said shift, Harlan and Greg, ran and notified the Supervisor, Donnie McLeese who separated Affiant from near combat with James Avery.
 AFFIANT FURTHER SAYS that he considered the incident to be over when after Donnie McLeese left, James Avery again returned to where the two (2) men were working and threatened to physically assault Robert Sallee and taunted him to go to a secluded location out back and fight.
However, after appellee Thomas Chiudioni investigated Sallee's claims, Avery was assessed a three day disciplinary layoff which, pursuant to an agreement with the union, was reduced to a one day layoff with the remaining two days suspended. See Affidavit of Dan Crowder, the supervisor of Labor Relations at Mansfield.
Appellants, in support of their argument that they are the victims of reverse discrimination, point to other incidents during which Avery allegedly threatened white male employees but was not sanctioned for doing so. As is set forth in detail in the statement of facts above, appellant David Wert contends that, in June of 1996 and in December of 1999, Avery threatened to kick Wert's "white mother fucking ass". There is, however, no evidence in the record that such threats were actually overheard by third parties. With respect to the first incident, Wert testified during his deposition as follows:
 . . . I turned around and was walking out to the press and he was right behind me saying, "You white racist son-of-a-bitch. You boys are all the same. You all stick together." And I got to the front of the press and the foreman and an alternate committeeman at the time pulled up on the cart, and I said, "You better do something with this guy." (Emphasis added.)
Deposition of David Wert at 12.
Wert, however, did not testify that the above two individuals actually overheard Avery's threats. When questioned by management about the incident in December of 1999, Wert testified that while other employees heard yelling "[t]hey said that they couldn't make out the words." Deposition of David Wert at 12. In accordance with appellee GM's policy of not disciplining one bargaining unit employee based solely on the uncorroborated statement of another bargaining unit employee, Avery was not disciplined. For the same reason, due to lack of corroborating witnesses, Avery was not disciplined after alleged threats he made in 1998, 1999 and 2000 to other GM employees.
Based on the foregoing, we find that appellants have failed to establish background circumstances "supporting the suspicion" that appellees are the unusual employer who discriminates against white employees. Clearly, in accordance with GM's policy, when Avery's conduct was corroborated by other employees, Avery was sanctioned for the same.
In addition, we concur with the trial court that appellants also have failed to demonstrate that they have been treated differently than similarly-situated employees who were not members of the protected group. While appellants maintain that appellee GM treated Avery, a black employee, in a more lenient manner than it would treat white employees who engage in the same type of misconduct, appellants, as the trial court notes, have presented no evidence regarding white employees who have threatened black employees or the discipline, or lack thereof, that such white employees received.
For the foregoing reasons, appellants' first assignment of error is overruled.
 II
Appellants, in their second assignment of error, argue, in essence, that the trial court erred in granting appellees' Motion for Summary Judgment on appellants' claims asserting a racially hostile work environment under R.C. 4112.02(A).[3] Appellants specifically assert that they have established a prima facie case of a racially hostile work environment.[4]
To establish a claim brought under R.C. Chapter 4112 against an employer for hostile work environment racial harassment, a plaintiff must establish (1) that the employee was a member of the protected class, (2) that the employee was subjected to unwelcome harassment, (3) that the harassment complained of was based upon race, (4) that the harassment had the purpose of effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment, and (5) the existence of respondeat superior liability. SeeBell v. Cuyahoga Community College (1998), 129 Ohio App.3d 461and Harrisv. Forklift Sys., Inc. (1993), 510 U.S. 17.
The Supreme Court of the United States has recently held that in order to be actionable, a hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton (1998), 524 U.S. 775, 787, citingHarris, 510 U.S. at 21-22. In Faragher, the court stated as follows:
 "We directed courts to determine whether an environment is sufficiently hostile and abusive by `looking at all the circumstances,' including the `frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' * * *
 "* * * We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment * * *"
Id. at 787-788, quoting Harris, 510 U.S. at 23.
Upon our review of the record, we find that appellants' work environment was not sufficiently hostile and abusive so as to constitute a racially hostile work environment. While Avery, who the trial court noted appeared to be "overally sensitive to racial hostility," may have called appellants and other employees racists and engaged in the unbecoming behavior that is set forth in detail in the statement of facts, we concur with the trial court that Avery's conduct, overall, "is not sufficiently severe or persuasive as to create a racially hostile environment, as a matter of law." The incidents involving Avery, which were limited in number over a period of years, primarily involved offensive comments (i.e. — Avery called appellants "racists".)[5]
Furthermore, when Avery's alleged threats were corroborated by other employees, appellee GM, in accordance with its company policy, effectively and adequately handled complaints regarding the same by suspending Avery.
Accordingly, we find that the trial court did not err in granting appellees' Motion for Summary Judgment on appellant's hostile work environment claim.
Appellants' second assignment of error is overruled.
 III
Appellants, in their third assignment of error, challenge the trial court's ruling that appellees were entitled to summary judgment on appellants' negligent infliction of emotional distress claims.
A claim of negligent infliction of emotional distress is limited to instances "where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril." Heiner v.Moretuzzo (1995), 73 Ohio St.3d 80, 86-87. The tort of negligent infliction of emotional distress assumes that a bystander or witness to a sudden, negligently caused event is traumatized by its emotionally distressing occurrence. Mason v. United States Fid. Guar. Co. (1990), 69 Ohio App.3d 309, 316, citing Paugh v. Hanks (1983),6 Ohio St.3d 72.
Since appellants, in the case sub judice, do not allege nor provide a factual basis to support a conclusion that they were traumatized bystanders or witnesses to a sudden, negligently caused occurrence, summary judgment was appropriately granted against appellants' claim of negligent infliction of emotional distress.
Appellants' third assignment of error is, therefore, overruled.
 IV
Appellants, in their fourth assignment of error, claim that the trial court erred in granting summary judgment for appellee Thomas Chiudioni since appellant David Wert "had proven a prima facie case of intentional infliction of emotional distress."
A claim for intentional infliction of emotional distress requires a plaintiff to show that (1) the defendant intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious. Hanly v. Riverside Methodist Hosp. (1991),78 Ohio App.3d 73, 82. The Ohio Supreme Court has stated that "`it would be absurd for the law to seek to secure universal peace of mind, and many interferences with it must be left to other agencies of social control.'"Yeager v. Local Union 20, Teamsters Chauffeurs, Warehousemen Helpers ofAmerica, 6 Ohio St.3d 369, 374, (quoting Prosser, Law of Torts (4 Ed. 1971) 51, Section 12). "Conduct rises to the level of extreme and outrageous only if it goes beyond all bounds of decency and can be regarded as atrocious and intolerable in a civilized society. Generally, it must be conduct that would lead an average member of the community to exclaim, `Outrageous!'" Perkins v. Lavin (1994),98 Ohio App.3d 378, 383. "As a matter of law, the conduct must be more than mere `insults, indignities, threats, annoyances, petty aggressions, or other trivialities.'" See Mason, supra. 317, (quoting 1 Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d).
As is stated above, appellants contend that the trial court erred in granting summary judgment for appellee Thomas Chiudioni, who is in Labor Relations, since appellant David Wert "had proven a prima facie case of intentional infliction of emotional distress." As appellees correctly note in their brief, it is not clear from appellants' brief which conduct of Chiudioni's forms the basis for such claim. However, when asked during his deposition why he had sued appellee Thomas Chiudioni, Wert responded as follows:
 Because he was — he was the one that disciplined me on false allegations from Frank Reed, and he treated me different just like James [Avery] treats me different.
 Q. Okay. You sued him because you were disciplined — is that right — for something dealing with Frank Reed. Correct?
A. Yes.
Q. What kind of discipline did you get?
A. Well, the first time it was balance of shift and a day.
 Q. And what was the incident dealing with Frank Reed that you were disciplined over?
 A. I asked him about a table that was being moved and he put — I asked him where we could put it because it was in my way, and he proceeded to tell me how to run the machine.
Q. Well, who is Mr. Reed?
A. He's a supervisor.
 Q. And you took offense at a supervisor telling you how to run your machine?
A. When he don't know what he's talking about, yes.
Q. Well, how did you get disciplined over that?
A. Because Frank said I threatened him.
Q. What did he say you did or —
A. That's what he said, that I threatened him.
Q. Do you remember about when this was?
A. `97 or `98, I'm not sure of the date.
Q. Who were you interviewed by?
A. Tom [Chiudioni].
Deposition of David Wert at 14-15. Wert, during his deposition, also took issue with Chiudioni's investigation of Wert after James Avery's accused Wert of using the word "chink" in a derogatory manner while at work.
Upon our review of the record, we concur with the trial court that Chiudioni's conduct, as a matter of law, was not "outrageous" or beyond all possible bounds of decency."[6] Rather, Chiudioni's actions in interviewing Wert and investigating Avery's accusation was within Chiudioni's authority as a Labor Relations Analyst. As part of his duties, appellee Chiudioni has the responsibility of resolving problems in the plant and investigating complaints. See Deposition of Thomas Chiudioni at 5.
Appellants' fourth assignment of error is, therefore, overruled.
 V
Appellants, in their fifth assignment of error, contend that appellees were not entitled to summary judgment on appellants' Whistleblower claims. Appellants specifically maintain that they were entitled to protection under Ohio's `Whistleblower Act' for reporting Avery's "propensity to assault and threaten fellow employees" to appellees.
"R.C. 4113.52, Ohio's `Whistleblower Act,' establishes guidelines by which an employee can bring to the attention of the employer or appropriate authorities illegal activities by either the employer or a co-employee without being discharged." Keefe v. Youngstown Diocese ofCatholic Church (1998), 121 Ohio App.3d 1, 5. "In order for an employee to be afforded protection as a 'whistleblower,' such employee must strictly comply with the dictates of R.C. 4113.52. Failure to do so prevents the employee from claiming the protections embodied in the statute." Contreras v. Ferro Corp. (1995), 73 Ohio St.3d 244, syllabus.
R.C. 4113.52, states, in relevant part, as follows:[7]
 (A)(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and if the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.
 (B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under either of those divisions. No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under that division . . .
Pursuant to R.C. 4113.52, an employee must file a "written report that provides sufficient detail to identify and describe the violation."An employee's failure to notify his employer in writing of alleged violations precludes an employee from recovery under the whistleblower statute. See Kulch v. Structural Fibers, Inc., (1997), 78 Ohio St.3d 134.
In the case sub judice, appellants never filed a written report with appellee GM or its management alleging that any law, work rule or company policy was being violated by James Avery. Since appellants, therefore, failed to strictly comply with R.C. 4113.52, we find that the trial court did not err in granting appellees' Motion for Summary Judgment as to the whistleblower claims.
Appellants' fifth assignment of error is, therefore, overruled.
 VI
Appellants, in their sixth assignment of error, assert that the trial court erred in granting appellees' Motion for Summary Judgment on appellants' claims that they were retaliated against for agreeing to testify in a federal lawsuit filed by Ron Damron. As is stated above, Damron filed a federal lawsuit against appellees and against James Avery after Avery allegedly assaulted Damron in 1997.
Under R.C. 4112.02(I), it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in [ R.C. 4112.02] or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." To prove a claim of retaliation, a plaintiff must establish three elements: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. Peterson v.Buckeye Steel Casings, (1999), 133 Ohio App.3d 715, 727.
Appellants all contend that appellees have retaliated against them for agreeing to testify in the federal lawsuit filed by Ron Damron against appellees and James Avery. Appellant James Johnson specifically maintains that appellees discriminated against him after he agreed to testify in Damron's case by, "in close proximity," having Johnson's tattoos analyzed after James Avery insisted that Johnson was a member of the Aryan Nations hit squad. The following is an excerpt from appellant Johnson's deposition testimony:
Q. Do you know Mr. Damron has also sued Mr. Avery?
A. No, I did not.
Q. You didn't know that?
 A. I heard rumors to it, but I'm not privy to what Mr. Damron is doing and I don't ask him specifics abut it; but yes, I did hear that he was taking legal action, also.
 Q. I thought one of the allegations in this Complaint is General Motors retaliated against you because you were going to testify on behalf of Mr. Damron, yet you tell me you know nothing of any lawsuit Mr. Damron has filed. How is that?
 A. To the best of my knowledge, I told you I did not know the specifics of Mr. Damron's case. I don't know if he may have dropped it since then. I don't know what the status is on it.
 Q. I thought you told me you didn't know if he had a case or not. Now you are telling me you knew of a case, but not the specifics of it.
 A. I have not seen anything from the courts telling me that yes, it is —
 Q. Did Mr. Damron ever ask you to testify for him in a case against Mr. Avery or General Motors?
 A. He asked me if I would if it come to that point, but that was quite some time ago.
 Q. This was probably back in 1997 back when most of this stuff is all going on?
A. No, it would be later than that.
Q. `98, maybe?
A. Maybe.
Q. But you don't know the status of that lawsuit.
A. No, I don't.
Deposition of James Johnson at 22-23.
Johnson also testified during his deposition as follows:
 Q. And tell me who in management knew of your agreement to testify on behalf of Mr. Damron?
A. I do not know.
 Q. Did you tell anybody in management that you were going to testify for Mr. Damron?
A. No one in management asked me.
 Q. Nobody has asked you. In fact, up until tody, have you ever testified on behalf of Mr. Damron in any court proceeding?
A. No, I have not.
 Q. And now would you please tell me how General Motors retaliated against you for agreeing to testify for Mr. Damron?
A. Through intimidation. You get the feeling that —
Q. Who is intimidating you?
A. General Motors.
 Q. General Motors. How did they know you were going to testify for Mr. Damron?
A. I do not recall.
 Q. In fact, you have no knowledge whatsoever whether, until you filed this lawsuit and alleged that, that General Motors had, quote, General Motors, or Mr. Chiudioni had any knowledge that you were going to testify for Mr. Damron.
A. I believe they knew.
Q. How?
A. Because they knew who was involved.
 Q. Well, did someone — tell me who from management came to you and threatened you with any type of problem at work if you testified for Mr. Damron. Anyone?
A. Through past practices you see that —
 Q. No, no, I'm asking — now, you answer my questions, okay? My question was who in management ever came to you and in any way threatened you, having anything to do with your job, if you testified on behalf of Mr. Damron?
A. They didn't specifically make that —
Q. So, the answer is no one did, correct?
A. No.
 Q. And if I understand it, you had your job in the blank and shear department, correct?
A. Correct.
 Q. Since 1997, the best of your recollection, you have not been disciplined in any way at General Motors, correct?
A. No.
 Q. You took a test and got into an apprenticeship program, correct?
A. Correct.
Deposition of James Johnson at 48-49.
In turn, appellant Anthony Walker contends, in appellants' brief, that after agreeing to testify, he was falsely accused of telling a sexually explicit joke. During his deposition, Walker admitted that his support for Damron consisted of "moral support" and that he had not actually testified or done anything with respect to Damron's lawsuit. When asked how appellee GM knew that Walker was supporting Damron in his lawsuit against appellee GM, Walker responded as follows:
 A. I think because we kind of buddied up together. There was four or five of us that kind of hung out.
 Q. Well, how would that tell General Motors that you were supporting him in his lawsuit against them?
A. I don't know how it would tell General Motors.
Q. Well, you have alleged that in your lawsuit.
 A. As I reiterate my statement, I think them seeing us, how we hang out, how we followed through on this —
Q. This is again you perception of the world.
A. Oh, yeah, my perception of politics at General Motors.
Deposition of Anthony Walker at 40-41. Finally, the remaining appellant, David Wert, in support of his argument that he was retaliated against for supporting Damron, points out that appellee GM immediately investigated James Avery's claim that Wert had used the word "chink" in a derogatory manner. As is stated above, Wert was not disciplined in any manner for allegedly making such comment.
Based on the above, we concur with the trial court that appellants "are hopelessly vague as to the "oppositional activities" that they have taken to support Ron Damron in his litigation against GM, and how it is that GM management is supposedly aware of such activities." None of the appellants testified that they informed appellee GM or anyone in its management of their alleged agreement to testify in support of Damron. Furthermore, it is not clear exactly how appellants supported Damron other than providing "moral support" to him. In short, the record does not support appellants' contention that they engaged in "protected activity".
Moreover, assuming arguendo, that appellants engaged in such "protected'"activity, we find that appellants failed to establish that they were subject to adverse employment action. In short, appellants have not shown that they were retaliated against. As noted by the court in Peterson, supra.
 The adverse action need not result in pecuniary loss, but must materially affect the plaintiff's terms and conditions of employment. Wille v. Hunkar Labs., Inc. (1998), 132 Ohio App.3d 92, 724 N.E.2d 492, citing Kocsis v. Multi-Care Mgt., Inc. (C.A.6, 1996), 97 F.3d 876. Factors to consider when determining whether an employment action was materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Crady v. Liberty Natl. Bank Trust Co. (C.A.7, 1993), 993 F.2d 132, 136. Changes in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action. Kocsis at 886.
Id. at 727. Merely being investigated as a result of complaints made by other employees clearly does not "materially affect" the terms and conditions of appellants' employment.
Accordingly, based on the foregoing, we find that the trial court did not err in granting appellees' Motion for Summary Judgment on appellants' retaliation claims.
Appellants' sixth assignment of error is, therefore, overruled.
 VII
Appellants, in their seventh assignment of error, claim that the trial court erred as a matter of law in finding that appellants' intentional infliction of emotional distress claims were preempted by Section 301 of the Labor and Management Relations Act, 29 U.S.C. 185. The trial court, in its February 26, 2001, decision, found, in part, that such claim was preempted "[b]ecause GM's actions, or inactions, in (1) disciplining Avery and in (2) investigating other employees' accusations of misconduct by the Plaintiffs necessarily involve an interpretation of the collective bargaining agreement, shop rules, and discipline policies that were in place at the Mansfield plant. . .".
However, the trial court, in its February 26, 2001, Memorandum Decision and Order, initially found that appellees were entitled to summary judgment on such claims since appellees' conduct, as a matter of law, was not "outrageous" or "beyond all possible bounds of decency." Since, in our discussion of appellants' fourth assignment of error, we concurred with the trial court's holding, appellants' seventh assignment of error is moot.[8]
 VIII
Appellants, in their eighth assignment of error, assert that the trial court erred in not finding that appellee Thomas Chiudioni, could be held individually liable to appellants for discrimination and harassment.
Appellants, in their reply brief, specifically contend that appellee Chiudioni, "in an effort to support James Avery went so far afield as to constitute harassment against the Appellants. From a study of the facts on the majority of allegations by James Avery concerning racism, Defendant Thomas Chiudioni accepted and commenced immediate interrogation of the Appellants on the allegations against James Avery." It is true that appellee Chiudioni investigated Avery's complaints that appellants used racist language or engaged in other offensive conduct. However, all of Avery's complaints were resolved in favor of appellants and appellee Chiudioni's investigation of the same clearly did not constitute harassment. Furthermore, having found that appellee GM is not liable for "co-employee harassment," this Court declines to find appellee Chiudioni individually liable.
Appellants' eighth assignment of error is, therefore, overruled.
 IX
Appellants, in their ninth assignment of error, argue that the trial court erred in not applying the doctrine of continuous violations to preclude the raising of the statute of limitations defense with respect to appellants' reverse discrimination claims. According to appellants, "[t]he statue of limitations period is tolled in instances of a continuing violation. The Defendant/Appellee(s) engaged in the continuing pattern of [reverse] discrimination such as to make any discriminatory act occurring outside of the two-year period actionable." In essence, appellants take issue with the application of the statute of limitations defense to their reverse discrimination claims.
The only claims that were dismissed based on a statute of limitations defense were appellants' defamation claims against appellees GM and Chiudioni. Appellants, in their appeal, have not challenged the trial court's dismissal of their defamation claims on statute of limitations grounds. Accordingly, since the trial court did not reject appellants' reverse discrimination claims on the basis of a statue of limitations defense, appellants' ninth assignment of error is overruled.
 X
Appellants, in their tenth assignment of error, appear to argue that the trial court improperly failed to consider the affidavits attached in support of appellants' brief in opposition to appellees' Motion for Summary Judgment. The trial court, in its February 26, 2001, Memorandum, Opinion and Order, stated, in part, as follows:
 "Walker and Wert submitted affidavit statements that a number of other GM employees were also threatened by James Avery. However, none of those individuals themselves submitted affidavits, and neither Walker's nor Wert's affidavit states how it is that they "know" that threats to these individuals occurred. For purposes of ruling on the Defendant's motion, these allegations will be disregarded as hearsay."
Appellants now seemingly imply that the trial court, in disregarding the hearsay allegations contained in such affidavits, failed to consider the affidavits of Anthony Walker, Robert Sallee and David Wert altogether and more, specifically, their statements in their affidavits that "they honestly and truly believed that Defendant, James Avery, threatened their lives when he mentioned his family will take care of his enemies and on another occasion specifically threatened to physically harm David Todd Wert for some effrontery that David Todd Wert did to him."
There is, however, no evidence in the record that the trial court failed to consider these affidavits, less the stricken hearsay allegations, in reviewing appellees' Motion for Summary Judgment and appellants' response to the same. For such reason, we will presume that the trial court correctly followed the mandates of Civ.R. 56 when ruling on appellees' motions for summary judgment. See Hartt v. Munobe
(1993), 67 Ohio St.3d 3, 7. ("An appellate court reviewing a lower court's judgment indulges in a presumption of regularity of the proceedings below.")
Appellants' tenth assignment of error is, therefore, overruled.
Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.[9]
By EDWARDS, J., HOFFMAN, J. and WISE, J. concurs.
[1] After filing their Notice of Appeal in the case sub judice, appellants voluntarily dismissed their claims against James Avery without prejudice.
[2] The full citation is McDonnell Douglas Corp. v. Green (1973),411 U.S. 792.
[3] Appellants, in their reply brief, assert that appellees "would limit the duty upon the employer to provide a hostile work environment to only issues involving sexual harassment."
[4] The trial court, in its opinion, found that appellants had not explicitly alleged a racially hostile work environment claim under R.C. Section 4112.02(A) in their complaint.
[5] See, in contrast, Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, in which the appellant alleged the offensive behavior occurred almost daily over a period of several months.
[6] For such reason, we need not address the trial court's alternative finding that the claim of intentional infliction of emotional distress was preempted by Section 301 of the Labor Management Relations Act,29 U.S.C. 185(a).
[7] Such section has since been amended, effective July 6, 2001.
[8] Appellants, in their brief, cite DiPuccio v. United Parcel Service
(1995), 890 F. Supp. 688 for the proposition that "causes of action related to assault are not pre-empted." In DiPuccio, the court specifically held that a former employee's intentional infliction of emotional distress claim, which alleged, in part, an assault on the employee by his supervisor, was not preempted by Section 301 of the Labor Relations Act, 29 U.S.C. § 185 et seq. However, as appellees note, in the case sub judice, none of appellants allege that James Avery ever physically touched them in a manner so as to constitute an assault.
[9] Appellants do not challenge the trial court's holding that appellants' claim for negligent retention or supervision of James Avery is preempted by Section 301.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas is affirmed. Costs to appellants.